People of State of Illinois, Plaintiff-Defendant in Error, v. John Williams, Alias Slats Williams, Defendant-Plaintiff in Error.

Gen. No. 9,964.

Third District.

May 16, 1955.

Rehearing denied July 21, 1955.

Released for publication July 21, 1955.

G. W. Horsley, and L. H. Lenz, both of Springfield, for defendant-plaintiff in error.

H. David Condron, State's Attorney of Adams county, and William J. Dieterich, Assistant State's Attorney, both of Quincy, for appellee.

MR. JUSTICE HIBBS delivered the opinion of the court.

The state's attorney of Adams county filed an information in the county court of that county charging that plaintiff in error kept and maintained at 223 North Third street, also known as the 223 Club, in the City of Quincy, a house of ill fame and place for the practice of prostitution and lewdness. The presiding judge of that county disqualified himself, and the county judge of Schuyler county presided at the trial. The jury found the defendant guilty and fixed his punishment at imprisonment in the county jail for one year and a fine of $200. A motion for judgment notwithstanding the verdict was denied. An alternate motion for new trial consisting of 101 assigned errors was likewise denied and the defendant was sentenced in accordance with the verdict. The cause comes here by writ of error.

The principal contentions of the plaintiff in error are that the court erred in denying a motion for judgment notwithstanding the verdict, in denying a motion for new trial, in the admission and exclusion of evidence and instructing the jury. By reason of such contentions it becomes necessary to set out in detail the evidence and the rulings of the court.

The conceded facts show that the plaintiff in error operated a tavern at the location stated. Prior to March 9, 1953 he and his wife, Audrie, were the owners in joint tenancy of the premises, but on the latter date conveyed the same to Bernice V. Lovelace, a sister of plaintiff in error, to whom no rent was paid. The city

329

and state liquor licenses for that location were issued to the father of Audrie. The entrance to the barroom was from Third street on the east. The bar ran along the south side of the room, and to the west there was an archway without doors which led to a second room, in which were wash and toilet facilities, and to the right a stairway led upstairs to certain quarters, consisting of three bedrooms and a bath. In the barroom were six tables and four chairs at each table, about fifteen stools at the bar, one or two juke boxes, a cigarette machine and two pinball machines. Helen Reeves, referred to in the record and known in the tavern by the name of Geraldine or Gerry Sims, was employed to work there by plaintiff in error on May 1, 1953 and Drucilla Warren, known in the record and in the tavern as "Lucky" Smith, was employed by the defendant's wife, Audrie, on June 1st of the same year. They occupied two of the upstairs bedrooms. On the evening in question, June 6, 1953, plaintiff in error was not present at the time of the occurrences hereafter related, but his wife was tending bar.

The state's attorney of Adams county engaged two deputy sheriffs of a neighboring county, named Bliven and Payne, to ascertain whether plaintiff in error was conducting a house of ill fame. Each was deputized as special deputy sheriff in Adams county. The arrangement made was in the nature of a raid. The two special deputies were to enter the 223 Club and about fifteen minutes afterward the city police were to blow a whistle and enter. The two deputies were given $20 and promised pay for their services. They entered the premises about 9:45 p. m. on June 6, 1953. What occurred thereafter is controverted.

According to the evidence adduced by the State, the Sims girl was then sitting at the bar with her arm around a customer. Each deputy sheriff ordered a glass of beer. While consuming their beverages at the bar, Sims came up to Bliven and asked if he would like

330

to go upstairs. The latter inquired if she had a girl for Payne. Whereupon Sims asked the wife of plaintiff in error then tending bar if "Lucky" was working, and upon receiving a negative answer brought "Lucky" Smith and the four of them went through the archway to the rear room, where the deputies were asked for money, and each paid $5 (marked money), which was then placed by the girls, or one of them, in a cigar box at the west end of the bar with a slip of paper. They then proceeded upstairs, Payne and Smith to one room, and Bliven and the Sims girl in another. Each girl directed her companion to undress and then went to the bathroom. On returning to their respective rooms, the girls proceeded to undress and were then arrested and handcuffed. Bliven permitted Sims to dress, but Payne refused to allow Smith to do so and threw a curtain around her. They were then taken downstairs and turned over to the Quincy police, who took them to police headquarters. After the raid one of the witnesses went back to the Club and found both plaintiff in error and his wife there, searched the register and cigar box, but found no money in either.

The defendant did not call his wife as a witness, but relied upon the testimony of Geraldine Sims, called as the court's witness, and of "Lucky" Smith. The Sims girl testified that her real name was Helen Reeves; that she had lived at Springfield all of her life; that when she came to Quincy, she did not know either the plaintiff in error or his wife or that there was such a place as the 223 tavern, but as she walked down the street, she saw a sign that a waitress was wanted, went in and was employed by Mrs. Williams; that she had never been a prostitute; that she received instructions not to take any money from men or to take them upstairs. She further stated that on the night of the raid "Lucky" Smith was menstruating and had gone upstairs alone; that she heard Smith holler and ran upstairs to see what was wrong, and when about half-

way up, a man threw handcuffs on her; that she had never agreed to give plaintiff in error one-half of her earnings that she made as a prostitute or in any other way; that she did not solicit any men; that she used the name, Geraldine Sims, because she didn't want it to get back to her family where she was working; that no man in the tavern that night gave her $5, nor did she put any $5 bill in the cigar box, nor did she invite any deputies or any other men to go upstairs; that after she was taken to the police station she was not questioned by anyone, was asked her name and where she lived, and then was taken upstairs in the county jail. During her cross-examination by the state's attorney she was asked if she did not in the presence of certain officers say that on the average she took in from the practice of prostitution at Williams' place $50 a week, of which she gave half to plaintiff in error. She denied making such statement and also denied she had been working there as a prostitute and further denied that the officer who arrested her gave her $5. This cross-examination was conducted over the objection of counsel for plaintiff in error.

"Lucky" Smith testified that her true name was Drucilla Warren, that she was twenty-two years old and her home address was Springfield, Illinois; that when she arrived in Quincy, she walked about town, stopped at the Williams tavern and asked if he could use her as a bartender. She accepted employment as a waitress, but never at any time had she been engaged in any activities of prostitution; that she never did take any men upstairs and have acts of intercourse with them; that on the day in question she was menstruating; that just before the raid she was sitting on a bar stool at the bar, but went upstairs to clean up and was in the bathroom in the nude when a man came to the door, grabbed her and put handcuffs on her; that he wouldn't let her put her clothes on, but she grabbed a curtain from the bathroom window—sort of a piece

332

of drape—and threw it around herself; that she did not take one of the two men upstairs with her that night; that he did not give her a $5 bill; that she did not put any $5 bill in a cigar box; that Sims had started upstairs when the handcuffs were put on her; and that she remained in the police station with Sims for about forty-five minutes before taken to the jail.

Both Sims and Smith testified that they were employed as barmaids and were paid at the rate of $18 per week plus tips and 10c for each drink the customers purchased for them, amounting to $1 or $2 a day, but each paid back to plaintiff in error $7 per week for their rooms and furnished their own food.

In rebuttal of the testimony of Sims the State produced three police officers of the City of Quincy, who testified that they were present in the office of the police matron of the City of Quincy on July 6, 1953 when Sims was interrogated following her arrest by the state's attorney, and that Sims admitted that she was employed at the Williams tavern as a prostitute and as such earned about $50 a week, half of which she gave to the defendant.

The court admitted over the objection of plaintiff in error the testimony of certain witnesses, three of whom were police officers, that the 223 Club, located at 223 North Third street, had a reputation as a house of prostitution. The grounds of the objection were that such evidence was immaterial and hearsay. The question of the reputation of such place was first injected into the cause by the plaintiff in error in the cross-examination of three of the People's witnesses. In order to establish that plaintiff in error was the operator of the tavern the State called among others, William Paul Carroll, C. F. Rost and Dorman E. Hall. Carroll testified that he was an employee of the Quincy Music Company and as such serviced a juke box at the tavern, at which time either the plaintiff in error or his wife was present and assisted in the checking and

dividing of the money. Notwithstanding the reputation of the place was not then in issue by the proofs, counsel for plaintiff in error brought out on cross-examination that Carroll did not see any prostitution or signs of prostitution being there carried on, and then was asked, "And the reputation of that place was good, wasn't it?", to which he replied to his knowledge it was. Rost also serviced a juke box there and testified substantially the same under direct examination as the witness, Carroll. On cross-examination counsel for the defendant developed that the witness never saw or heard of any prostitution being carried on there. Hall, the father-in-law of plaintiff in error testified that the city and state liquor licenses were issued to him, and that in obtaining the licenses he was merely helping out his son-in-law and daughter. However, on cross-examination he was asked, "Did he (Williams) have a good reputation there for running a respectable place without any prostitution going on?", and he answered, "So far as I know."

The case of People v. Newbold, 260 Ill. 196 and other cases are cited in support of the claimed erroneous ruling. The Newbold case, supra, was a prosecution under the same section of the criminal code and it was there said at page 200: "It was competent for the witness to testify to the reputation of the plaintiff in error but not to give an opinion as to whether he kept a disorderly house." However, it was later said in People v. Berger, 284 Ill. 47 at page 50: "Most authorities agree that on a prosecution for keeping such a house as this the State may prove the character of the inmates and frequenters of the house, and many courts hold it can prove the reputation of the house."

■ We do not find it necessary to pass upon the admissibility of the reputation of the 223 Club. The plaintiff in error deliberately injected the issue into the case as above set forth and ought not to be heard to object to the propriety of adverse testimony offered

334

by the People to meet the issue he first inserted in the cause. In Kuhn v. Eppstein, 239 Ill. 555, the court say at page 557: "If the evidence for the appellee was incompetent so was that for the appellants, and they ought not to be heard to complain that evidence of the same character which they offered was not proper." To the same effect is Bogart v. Brazee, 331 Ill. 160, 181; Moore v. Schoen, 313 Ill. App. 367, 371. Although these cases were civil cases we believe the rule there announced is applicable to criminal prosecutions.

■ ■ Plaintiff in error also contends he was unduly restricted in the cross-examination of the People's witnesses who testified as to the reputation of his place of business. The only question involved upon which comment should be made is the rulings that the cross-examiner might not inquire as to what specific persons had said it was a place of prostitution. The general rule is that the scope of the cross-examination is within the sound discretion of the court, and unless that discretion is abused there is no error committed in restricting such examination. (People v. Nakutin, 364 Ill. 563, 571; People v. Jones, 343 Ill. 291, 295.) The issue here made by plaintiff in error was the general reputation of his place of business in that community. What any one person might have said to any of the witnesses on that subject is not material, but under the issue thus made, his cross-examination was properly limited to the general reputation of the place in that community. Incidentally it should be mentioned that the court permitted witnesses to answer that their information came from various places about the city. The court did not abuse its discretion.

■ It is next submitted that the conversations between Bliven, Payne, Sims, Smith and the defendant's wife, having taken place out of the presence of plaintiff in error, were not admissible, and the rulings of the court in that respect constituted prejudicial error. The principal case cited in support of that con-

335

tention is People v. Newbold, 260 Ill. 196. There the defendant was charged with keeping a common, ill-governed and disorderly house to the encouragement of fornication. A detective went to the home with two girls picked up on the street (not employees of the defendant) and the trial court admitted a conversation with them out of the presence of the defendant. We do not regard that case and similar cases as controlling under the facts and circumstances existing here. About three months before June 6, 1953 the plaintiff in error and his wife, then the owners of the premises at 223 North Third street, conveyed the same to his sister, to whom they paid no rent. The city and state liquor licenses were issued not to Williams, but to his father-in-law. The uncontradicted evidence shows that Mrs. Williams was the active agent of the defendant in the operation of the business and was on the day in question on duty tending bar. One of the girls was hired by Williams and the other by his wife, at meager wages, out of which they were required to pay for their own board and lodging. The tavern room opened through an archway without doors to a back room from which led an open stairway to the bedrooms and bath on the second floor, occupied by Sims and Smith. The uncontradicted evidence also shows a cigar box on the west end of the bar. The State's case showed the approach made by Sims to the deputy, the question to Mrs. Williams, "Is 'Lucky' working?", her reply thereto, the bringing of "Lucky," the transaction in the rear room, the payment of the money and placing of it in the cigar box, the ascent of the stairway, the entry into the respective rooms, the use of the bathroom and undressing of the girls, the disappearance of the money in the cash box and cash register. All of this evidences a conspiracy of plaintiff in error and his wife and the two girls to conduct and operate a house of ill fame. In People v. Borrelli, 392 Ill. 481 at page 493, it is said: "The existence of a conspiracy may be proved not only

336

by direct evidence but also by inference from conduct, statements, facts and circumstances which disclose a common design on the part of the accused and others to act in pursuance of a common criminal purpose." To the same effect is People v. Link, 365 Ill. 266, 281, 282.

██ It is well established that where a conspiracy exists to violate the criminal laws that all conversations between coconspirators in carrying out the unlawful act or acts are admissible against the party on trial, even though made out of his presence. This is true notwithstanding the indictment did not charge a conspiracy. (Raymond v. The People, 226 Ill. 433, 436, 437; People v. Hedge, 284 Ill. 513, 516, 517; People v. Pavluk, 386 Ill. 492, 498.) Under these circumstances we conclude that the conversations between the employees of the defendant and the two deputy sheriffs and the conversation between Sims and Mrs. Williams, occurring at the 223 Club that evening, were admissible in evidence.

██ The state's attorney moved the court to call Geraldine Sims as the court's witness, and in so doing represented that he could not vouch for her credibility, that she and "Lucky" Smith had each been released on bond and since then had been living at the home of plaintiff in error, that during the trial he had interviewed Sims and she had denied making certain statements at the police station on the night of June 6, 1953 concerning the nature of her employment in the 223 Club. Over the objection of counsel for plaintiff in error the motion was allowed and the action of the court in this regard is assigned as error. In People v. Laster, 413 Ill. 224 at pages 231 and 232, it is said: "The rule permitting the court to call an eyewitness was announced in Carle v. People, 200 Ill. 494, where it was said that when a state's attorney knows that a witness was present at the scene of a crime, but he has no confidence in the witness or doubts his veracity or

integrity, he is not obliged to call such witness. Then the court may call the witness, leaving him open for cross-examination by either side. We later announced that this rule should be confined within narrow limits, being adopted only where it is shown that otherwise there might be material injustice. (People v. Johnson, 333 Ill. 469.)" It was important to the People's case to establish that the two girls were in the employment of Williams and the nature of such employment. The admitted circumstances in the case warranted the state's attorney in saying to the court that he could not vouch for the credibility or integrity of the witness. Moreover during the cross-examination of this witness she denied the making of certain statements to the state's attorney in the presence of others in the police station concerning the nature of her employment, which clearly indicates that the state's attorney was justified in his statement that he could not vouch for her integrity or credibility. The showing made by the People was sufficient to justify the action of the court in calling the witness as a court's witness.

On cross-examination by the People this same witness admitted not only her employment but that of "Lucky" Smith, but denied she was engaged as a prostitute or as such earned $50 a week, half of which she gave to plaintiff in error and denied she solicited the deputy sheriff, who arrested her. Thereafter three police officers of the City of Quincy testified that at the police station on the evening in question in reply to questions of the state's attorney, Sims stated she was employed by plaintiff in error as a prostitute and earned $50 a week as such, half of which she paid to him, and did solicit the deputy sheriff. No question is raised as to the method or foundation laid for the impeachment of the witness, but complaint is made of the fact that over the defendant's objection in each instance, when the witness was testifying, the court told the jury that the testimony of such witness was not to

be considered as to the guilt or innocence of plaintiff in error but was to be considered only for the purpose of impeaching the credibility of the witness, Sims. It is contended that such statements by the court unduly emphasized the purport of the impeaching testimony.

██ Statements made by a witness out of the presence of the accused, inconsistent with his testimony on the trial are admissible for the purpose of impeaching the credibility of the witness, but cannot be received as proof of the innocence or guilt of the defendant. (Ritter v. People, 130 Ill. 255, 260; People v. Dascola, 322 Ill. 473.) In South Park Com'rs v. Ayer, 245 Ill. 402, the court say at page 410: "The court, in ruling upon the objections of counsel in the course of the examination of a witness, has the right to state the grounds which form the basis of its ruling," and concluded that such ruling was not within the statute which required instructions to the jury to be in writing. In People v. Dascola, 322 Ill. 473, the court quotes with approval Gould v. Norfolk Lead Co., 9 Cush. 346, as follows: " 'It is no evidence whatever that the facts are as he formerly stated them, and though appeals are sometimes made to a jury that it is so, it is the province of the court to inform them (the jury) it is not so.' "

██ The impeaching evidence was only admissible as affecting the credibility of the witness, Sims, and not as proof of the guilt of the accused. Unless the jury was advised of the limitation of such testimony, and for what purpose it was to be considered, the jury could well have believed it was proof of the guilt of the accused. It is true that the People offered and the court gave an instruction on that subject in its written charge, but we deem the statement of the court at the time the evidence came in as beneficial to the plaintiff in error instead of prejudicial.

It is also contended that the court erred in admitting impeaching testimony as to Sims on an immaterial

339

issue, such as her home and as to both Sims and Smith, as to where they lodged their first night in Quincy. In view of the conclusion hereinafter stated as to the condition of the record, we do not believe that the admission of such impeaching testimony, even if error, was prejudicial.

In support of the contention that the verdict is contrary to the competent evidence, plaintiff in error cites People v. True, 235 Ill. App. 349; People v. Newbold, 260 Ill. 196; People v. Knaze, 297 Ill. App. 256. We do not regard these cases as decisive or persuasive, due to the factual differences that exist. We have heretofore set out the salient facts and circumstances in this cause, and they need not be here repeated. We have no doubt that guilt may be shown either by direct evidence, which in most cases of this character is impossible or impracticable, or by circumstances from which according to the rule of common sense and reason guilt is inferable. (People v. Berger, 284 Ill. 47, 50, 52.) We are satisfied that there is from this record no reasonable doubt of the guilt of plaintiff in error. This is true even though the conversation on the evening in question between Bliven, Payne, Sims and Smith and the defendant's wife are excluded from consideration. All the surrounding facts and circumstances and actions and things that the parties did that night compels the same conclusion. We recognize that a person charged with the commission of an offense must be proved guilty by the prosecution beyond all reasonable doubt, and that the defendant is not required to prove his innocence. It is noteworthy, however, that the defendant called certain witnesses on his own behalf, but failed to put his wife on the witness stand. It appeared that she was assisting in the operation of the business and was an agent of her husband in that regard. She was tending bar on the evening in question. She knew whether Sims asked if "Lucky" was working. She knew whether there was a cigar box on

the west end of the bar and whether the two girls were prostitutes and the place a house of prostitution. As to these subjects, she was a competent witness. (Sec. 6, Division XIII Criminal Code, Par. 734, Chap. 38, 1953 Illinois Revised Statutes [Jones Ill. Stats. Ann. 37.720].) The failure of the defendant to avail himself of his wife's testimony is merely an incident which confirms our conclusion as to the defendant's guilt.

Complaint is made of Instruction No. 1 and Instruction No. 10 given by the court on behalf of the People. Instruction No. 1 was as follows:

"The court instructs the jury that while it is proper to impeach or discredit a witness by proving statements made by such witness at some other time and place different from his testimony in the case on trial, still any statement that any witness may have made at such other time and place is not to be considered by you as any evidence of the guilt or innocence of the defendant. You should consider such evidence, if any has been shown, solely on the question of impeachment or discrediting of such witness."

Instruction No. 10 was as follows:

"The court instructs the jury that one method of impeaching a witness is by showing that he has made statements out of court or in court or other hearings, at variance with statements on the witness stand, and if the jury believe from the evidence, that any witness in this case has made statements at any other time or place at variance with his evidence in this case, you have a right to take such fact into consideration in determining the weight to be given the evidence of such witness."

 It is contended that the instructions are defective in that they fail to limit their application to material matters in issue in the case, and also particularly prejudicial because the court permitted the introduction of impeaching testimony as to Sims, on an

341

immaterial issue, such as her home, and as to both Sims and Smith, as to where they lodged the first night they were in Quincy. The material issues in the cause were properly defined by not only defendant's Instruction No. 5 but by People's Instruction No. 5. By both Instruction No. 10 tendered by the defendant and Instruction No. 12 tendered by the State, the jury was in substance told that if they believed any witness testifying on behalf of either side had wilfully and corruptly sworn falsely to any fact material to the issue in the cause, as defined in the instructions, they had a right to disregard the testimony of such witness, unless corroborated by other credible evidence. We believe that both People's Instruction No. 1 and Instruction No. 10 should have been limited to the material issues in the cause, but in view of the other instructions that were given on behalf of both the People and the plaintiff in error, and the nature and character of the proofs in the cause, the plaintiff in error was not prejudiced by the giving of such instructions. (People v. Thompson, 406 Ill. 323, 327.)

In People v. DeRosa, 378 Ill. 557, the court say at page 563: "A particular instruction need not contain all the law either of the case or upon a given subject. It is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the People and of the defendant, respectively."

We have considered all other questions raised and find that plaintiff in error was not prejudiced by the rulings of the court, or the argument of the People to the jury. We are satisfied that the defendant received the kind of a fair and impartial trial he was entitled to have.

The object of a review is not to determine whether the record is free from error, but to ascertain whether a just conclusion has been reached upon competent and sufficient evidence after trial in which

no error, prejudicial to the defendant's rights has occurred. (People v. Booker, 378 Ill. 334; People v. Shelton, 388 Ill. 56; People v. Vaughn, 390 Ill. 360; People v. Kennay, 391 Ill. 572.) While this record is not free from error, we do not believe the defendant was prejudiced by any rulings of the court. The competent evidence proved guilt beyond a reasonable doubt, so that the jury could not conscientiously have arrived at any other verdict. The judgment of the county court of Adams county is affirmed.

Judgment affirmed.