**UNITED STATES of America,
Appellee,**

v.

**Graziano J. MANCUSO, Appellant.**

**No. 10822.**

United States Court of Appeals
Fourth Circuit.

Argued March 6, 1967.

Decided May 19, 1967.

Norman P. Ramsey, Baltimore, Md. (Thomas J. S. Waxter, Jr., and H. Thomas Howell, Baltimore, Md., on brief), for appellant.

Ronald T. Osborn, Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., Arthur K. Crocker and Clarence E. Goetz, Asst. U. S. Attys., on brief), for appellee.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

Graziano Mancuso was convicted by a jury of attempting to evade income taxes for the years 1956 through 1960.[1] In this appeal he attacks his conviction on two broad grounds: (1) insufficiency of the Government's case based on the net worth method of proof, and (2) misconduct of Government agents amounting to a denial of his Sixth Amendment right to the effective assistance of counsel, his Fifth Amendment right not to incriminate himself, and his Fourth Amendment right to be secure from unreasonable search and seizure.

### I.

The evidence was amply sufficient for the jury to have found that the defendant had been since 1945 the dominant member of a family partnership, V. Mancuso & Sons, a barber supply business

---

1. He was indicted and convicted on five separate counts under § 7201 of the Internal Revenue Code of 1954, 26 U.S. C.A. § 7201, and was sentenced to one hundred and eighty-three days imprisonment.

in Baltimore; that the defendant's brother, Nicholas, was also a partner, and his son, Vincent, Jr., became a partner in 1958; and that the defendant's father, Vincent, Sr., who was described as a "limited partner" from 1945 until 1958, when he retired from the business, was salaried during this time and did not share in the profits. The defendant testified that ninety-eight percent of all partnership receipts were in cash.

The Government's comparative net worth analysis of the defendant showed an increase in personal net worth over the five years for which prosecution was undertaken of approximately $63,000, of which some $52,000 was shown as derived from unreported taxable income.[2]

2. The Government's comparative net worth schedule for the defendant showed the following:

| Date | Defendant's Share of Partnership Net Worth (capital) | Total Personal Net Worth (Assets less liabilities and depreciaiton) | Increase in Personal Net Worth During Year | Understated Taxable Income |
|---|---|---|---|---|
| 12/31/53 | $26,130. | $83,655. | | |
| 12/31/54 | 30,371. | 90,922. | $ 7,267. | $ 6,535. |
| 12/31/55 | 32,581. | 101,578. | 10,657. | 10,298. |
| 12/31/56 | 38,393. | 113,141. | 11,563. | 9,735. |
| 12/31/57 | 42,759. | 144,531. | 31,390. | 26,108. |
| 12/31/58 | 47,393. | 153,743. | 9,212. | 10,036. |
| 12/31/59 | 48,342. | 157,132. | 3,389. | 4,177. |
| 12/31/60 | 50,511. | 164,437. | 7,305. | 2,022. |

Note: Figures have been rounded off to the nearest whole number.

In calculating the defendant's taxable income in a given year, the Government in its net worth schedule adjusted the increase in his personal net worth by adding expenditures which do not result in asset accumulation (e. g., daily living expenses and purchases of gifts for other persons) and subtracting, *inter alia*, the defendant's personal exemptions and the standard deduction.

---

The consistent increases in the defendant's personal net worth were attributed by the Government almost exclusively to income from the family partnership.

The Government ascribed $19,000 of the growth in the defendant's net worth over the five year period to increases in the value of his share of the partnership capital. The Government's personal net worth analysis on the defendant included in each year as one asset an apportioned share of the then current partnership capital.[3]

The defendant maintains that there was a complete lack of evidence to support the Government net worth schedules which were therefore improperly admitted in evidence, and thus his case was erroneously permitted to go to the jury. The challenge to the Government's proof relates specifically to determination of his interest in the partnership capital and its use in calculating his personal net worth. Other assets (and expenditures) in the Government personal net worth schedule were based on direct evidence introduced at trial.

The defendant concedes that amounts assigned by the Government to business assets, liabilities, and depreciation reserve in constructing a comparative net worth statement for the family partnership were proved by competent evidence at his trial.[4] He contends, however, that key "assumptions" made by the Government in establishing his share in the

3. See note 2 supra.

4. The Government prepared a comparative net worth statement on the partnership from which was determined the figure listed as "Partner's Share in V. Mancuso & Sons" (termed "Defendant's Share of Partnership Net Worth" in note 2 supra) among the assets in the Government's

partnership capital are unsupported by direct evidence.

The Government's theory allocated to the defendant and Nicholas Mancuso each one-half of the partnership capital on December 31, 1953, the starting point in its net worth schedules. Thereafter they were credited with an even one-half of the increments in partnership capital until the addition of Vincent, Jr. in 1958, after which one-third was allotted to each. However, the Government analysis did not assign to Vincent, Jr. any part of the accumulated firm capital. Although the family business began as Vincent, Sr.'s proprietorship, the Government theory does not allow him an interest in the firm capital during the prosecution period.

The jury accepted the Government's theory and, we think, was entitled to do so. It is true that there was a scarcity of direct evidence relating to the ownership interests in the partnership capital. All the evidence was to the effect that there was no capital account as such, and the partnership tax returns did not include a capital account reconciliation.[5] However, circumstantial evidence was plainly sufficient to support the Government's inferences.

The Government's position that Vincent, Sr. was without a capital interest in the prosecution years is strongly supported by evidence at trial. The partnership tax returns for the years under examination show that he was salaried and did not receive a part of the part-nership profits. Furthermore, Internal Revenue Agent Gordon testified that he had an "absolute disclaimer" from the defendant of any interest of his father, Vincent, Sr., in the partnership. Agent Gordon further testified that the defendant had told him that beginning in 1945 Vincent, Sr. had "gradually relinquished and he turned [the partnership over] to the two * * *" sons and that Vincent, Sr. remained a "limited partner" and received a salary for little things he did about the place.

The inference that Vincent, Jr. did not acquire any part of the accumulated firm capital on acceptance as a partner in 1958 rests on testimony of Agent Gordon that Vincent, Jr. had told him that he brought nothing into the partnership. This was not denied by the defendant.

There was more than sufficient evidence at trial showing the defendant's dominance of the business for the jury to infer that he had at least an even one-half interest in the partnership capital in 1953 and that he owned an equal part of annual increments in firm capital. So comprehensive was the defendant's control over affairs of the family business, especially the financial ones, a reasonable inference would have been that the partnership-in-name was in fact his sole proprietorship. The defendant was proved to be the only active partner who could and did write checks on the business checking account and who could draw on the partnership savings account.[6] The defendant testified that he

---

personal net worth schedule on the defendant. The Government's partnership statement, however, computed partnership capital solely from assets and liabilities at the end of the tax years in question and did not include an examination of capital contributions and withdrawals, if any.

5. The defendant himself testified at trial that there was no capital account. He also testified that he told Government agents that there was "just a family arrangement". Internal Revenue Agent Gordon testified that "[a]ll we were able to learn from the whole partnership, all the members, was that they maintained no capital account."

6. Both business accounts, records of which were introduced in evidence by the Government, are in the joint names of Vincent, Sr. and the defendant. However, the defendant testified that he was the only one who wrote checks and Agent Gordon testified that the defendant told him that Vincent, Sr.'s name had been placed on the savings account, "although he was no longer truly a partner, and it was not the father's money, * * * out of respect, so that in the event anything happened to * * * Graziano Mancuso, the father could be expected to see that everyone was taken care of."

alone maintained the partnership books and records. He did not account to other members of the firm.[7]

■ Granting to defendant the benefit of any doubt, the Government attributed to him on its net worth theory only an equal part of the initial partnership capital and increases in net worth. The apportionment made by the Government followed the distribution of profits as reported on the partnership tax returns which were in evidence, and as stated in testimony by Agent Gordon, conformed to the ordinary legal presumption that in absence of evidence of an agreement to the contrary the partners' interests are equal.[8]

The defendant's principal defense was the familiar cash hoard and gift explanation. He admitted on the witness stand that the immediate source of the funds which inflated his personal bank accounts and paid for physical assets appearing on the Government net worth schedule during the years 1953 through 1960 was the partnership checking account. However, he maintained that the money withdrawn for these purposes did not represent partnership profits but were funds placed in the business accounts for convenience and actually derived from funds acquired before the prosecution period or received as gifts from members of his family.[9]

Inconsistently and in contrast to the position taken by his client, the defendant's counsel advanced the theory at trial and before this court that the Government had not refuted the possibility that the personal assets of his client could have been acquired with partnership capital which had accumulated to his credit before the starting point in the net worth analysis, December 31, 1953. The Government in fact concedes[10] that the defendant would *not* be delinquent in reporting income if it is presumed that in 1953 he owned the entire partnership capital and thereafter when taking funds from the partnership account to enhance his personal asset position drew only on his accumulated capital and took no partnership profits in excess of those reported on his tax return. This was the theoretical possibility illustrated by a hypothetical net worth schedule used by counsel for the defense at trial. Such a possibility appears to be controverted, however, by the defendant's own explanation of asset accumulation. Suffice it to say that the jury—within its competence—accepted neither defense theory.

Because of the omission of the defendant to maintain adequate records the Government was forced to proceed in its prosecution with the net worth method of proof. Its case, therefore, was necessarily grounded in circumstantial evidence. The jury considered the evidence bearing upon the defendant's partnership interest along with the evidence of other assets and purchases, and weighing the defense theories, made the ultimate inference, with which it was satis-

---

**7.** Agent Gordon testified that the defendant told him that "he maintained the books and records, he was the only one who could write checks and he generally ran the business, in his words. He prepared all returns for the business, except the state and federal income tax returns and the partnership return, which were prepared by * * * " a CPA from his records.

**8.** See Uniform Partnership Act § 18; 68 C.J.S. Partnership § 85b at 526–527 (1950).

**9.** The defendant, for example, testified that he received from his father during the prosecution years some $9,000, which was placed in the partnership checking ac-

count. He also testified that his wife had received a large sum of money—around $20,000.—from her mother which was turned over to him from time to time and eventually found its way to the business checking account, and from there into the purchase price of a home.

The following dialogue occurred at the close of the defendant's testimony:

*The District Judge:* "And you say that most of the money that we are concerned with here came either from your father or your in-laws, is that right?"

*The Defendant:* "Yes, Your Honor."

**10.** The concession was made in oral argument before this court.

fied beyond a reasonable doubt, that during the years covered by the indictment the defendant had received substantially greater income than he reported on his tax returns.

What this court said in Moore v. United States is pertinent:

"If [circumstantial evidence] be sufficient to support an inference of guilt and the defendant fails to offer a reasonable explanation consistent with innocence, such failure may be considered by the trier of fact. It is not necessary, in appraising the sufficiency of the evidence, that this court be convinced beyond a reasonable doubt of the guilt of the defendant. The question is whether the evidence, construed most favorably for the prosecution, is such that a jury (or trial judge) might find the defendant guilty beyond a reasonable doubt." 271 F.2d 564, at 568 (4th Cir. 1959) (case citations omitted).

We stated in Bell v. United States that [a]n estimate of the taxpayer's net worth as the means of determining his income is resorted to in the absence of accurate records which it is his duty under statute to make and to preserve, and by its very nature it is an approximation; * * * the absence of proof of the exact amounts of unreported income is not fatal if there is *substantial evidence tending to prove the defendant's guilt beyond a reasonable doubt.* 185 F.2d 302, 308–309 (4th Cir. 1950) (emphasis added).

We have in our review of this case heeded the Supreme Court's admonition that courts should closely scrutinize use of the net worth method of proof because "it is so fraught with danger for the innocent." Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1955). We have examined the district court's charge and find it especially clear and inclusive of all the elements set out in *Holland.* 348 U.S. at 129, 75 S.Ct. at 132. We conclude that the Government established with sufficient certainty the defendant's opening net worth. See Holland v. United States, 348 U.S. at 132, 75 S.Ct. at 134.

In addition, the Government in the present case tracked "down relevant leads furnished by [the defendant]—leads reasonably susceptible of being checked, which, if true, would establish his innocence." Holland v. United States, 348 U.S. at 135–136, 75 S.Ct. at 135. There was plentiful evidence supporting the inference that the defendant's net worth increases were "attributable to currently taxable income." Holland v. United States, 348 U.S. at 137, 75 S.Ct. at 136.

There was sufficient independent evidence, in addition to the defendant's own statements, for the jury to find that the Government had established the elements of its case beyond a reasonable doubt, including the element of willfulness which was the compelling inference from the consistent pattern of underreporting. See Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954).

## II.

The defendant's contention that he was denied Fourth, Fifth, and Sixth Amendment rights is based in large part on the conduct of an Assistant United States Attorney in examining and copying certain defense files. Contemplating using as a witness Milton Duke, C.P.A., who had prepared defendant's tax returns for many years, Government counsel interviewed him on more than one occasion. On September 7 or 8, 1965, Duke came alone and willingly to the United States Attorney's office and brought his file on defendant. He voluntarily disclosed it to the Assistant United States Attorney and Internal Revenue agents. Included were net worth schedules prepared at the request of defendant's counsel. The file also contained letters to Duke from defendant's counsel which Agent Gordon said the Government "studiously avoided looking at * * *."

The Government agents made copies of the defense net worth schedules and compared them with their projected ones.

The matter was not kept secret. Defense counsel was promptly and fully advised of the occurrence, and as promptly responded with a motion to suppress. At a two-day hearing on the motion, the district court heard evidence and sensibly considered alternative remedies:

  (a) evening things up by requiring the Government to produce *its* net worth statement;

  (b) suppressing the physical evidence obtained from Duke and any of its fruits;

  (c) dismissal of the indictment— urged by defense counsel to be the only adequate remedy.

The district judge rightly concluded that sufficient protection would be afforded defendant short of a dismissal that would end the cause and exculpate the defendant. He ordered that "the net worth statements and all related papers, whether incriminatory or not, prepared by Mr. Duke at the direction of [defendant's counsel] and for [his] use in the defense of [the defendant], are ordered suppressed as is any evidence that might have been revealed by those papers." The defense was given the right to object during the trial to any evidence it felt the Government obtained from the documents. The district court, in addition, granted the motion for production of the *Government* net worth schedules. Moreover, the court ordered a continuance for at least sixty days to give defendant's counsel an opportunity to acquire a new accountant.[11]

We need not consider the underlying questions of whether the schedules copied were in fact counsel's work product, and if so, privileged, or whether there was a waiver. Clearly, any prejudice resulting from an assumed violation of the Fourth or Fifth Amendments was cured by the extraordinary remedial order of the district court. "[N]umerous precedents ordering the exclusion of \* \* \* illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, 515 (1966). Moreover, the Supreme Court has never "expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing [12] will not reveal it." Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, 382 (1966).

■ The defendant next complains that he was denied his Sixth Amendment right to the effective representation of counsel by Government use of information gathered in several interviews with Milton Duke in the investigative stage of the proceedings and as a prospective Government witness during preparation for trial. Since an accountant is indispensable to defending a net worth case, it is argued that getting the cooperation of the accountant is the same as penetrating the constitutionally protected relationship of attorney-client. We think not. There was here no "surreptitious invasion by a government agent into the legal camp of the defense", nor indeed any "government intrusion"—gross or otherwise—upon the confidential relationship between defendant and his counsel. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, 384 (1966). The Government engaged in no electronic surveillance, wire tapping, or deception. Compare Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d

---

11. The court also forbade the Government to consult further with Milton Duke. We have no occasion to review the propriety of this unusual sanction since the Government took no exception to it.

12. The defendant entrusted Duke only with his tax records. He confessed no wrongdoing to Duke, or if he did, his confidence was not breached.

879 (1953); Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (D.C.Cir. 1951). Certainly on the facts of this case there was no infringement of the Sixth Amendment right to counsel.

Defendant was indicted on April 9, 1963. The district court refused to suppress evidence gathered and statements made to Internal Revenue Service agents at two conferences with the defendant in June and December 1961. Defendant asserts that his right not to be compelled to be a witness against himself was abridged because he was insufficiently warned. The defendant was accompanied by an attorney and his accountant (the same Milton Duke) when he first met with Internal Revenue agents. The uncontroverted testimony by Agent Gordon was that at this meeting he advised the defendant "that under the Constitution of the United States he may refuse to answer any question the answer to which will tend to incriminate him * * *." We think this more than sufficient.

The defendant was not in custody. He attended the meetings under no compulsion save his own or counsel's judgment that it was in his best interest to do so.

The hearing on the motion for suppression of evidence and the trial in the present case were conducted after the decision of the Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but prior to the decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because of the time sequence, Escobedo is more pertinent than Miranda. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Though these cases involved state prosecutions and were decided under the Fourteenth Amendment, the principles may apply in federal tax cases. See S. Duke, Prosecutions for Attempts to Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1, 37 (1967).

But Escobedo and Miranda do not apply to a tax audit, i. e., an investigation by revenue agents of a taxpayer's tax returns and records for the purpose of determining whether or not additional taxes are due and whether or not a crime has in fact been committed. See Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965). Neither suggest a duty to warn one who, like the defendant, is not under arrest and whose freedom of action is not curtailed.

If it be assumed that defendant and his lawyer were unaware of his legal right to resist the investigation, the result is the same. That defendant subjectively may not have known of his rights does not vitiate his voluntary disclosures made with advice of counsel. United States v. Spomar, 339 F.2d 941 (7th Cir. 1965), cert. denied, 380 U.S. 975, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965).

The courts uniformly hold that a taxpayer's ignorance of the nature of an investigation by the Internal Revenue Service and of his legal right to resist "is insufficient ground for suppression of evidence voluntarily given." S. Duke, Prosecutions for Attempts to Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1, 36–37 (1966); see, e. g., Turner v. United States, 222 F.2d 926 (4th Cir. 1955).

At the time of these conferences no decision had been made to prosecute. "Explicit warnings need not be given concerning possibilities that may never come to pass." Greene v. United States, 296 F.2d 841, 842 (2d Cir. 1961).

Revenue agents, during the course of an investigation of a taxpayer's returns, and prior to determining upon criminal prosecution, "have no duty to apprise a taxpayer that he need not furnish requested information and that if he does furnish such information it may be used against him in criminal proceedings." United States v. Spomar, 339 F.2d 941, 942 (7th Cir. 1964), and cases cited therein.

Affirmed.