**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter P. MACKIEWICZ and Florence B.
Mackiewicz, Defendants-Appellants.**

**No. 507, Docket 32145.**

United States Court of Appeals
Second Circuit.

Argued May 15, 1968.

Decided July 10, 1968.

Certiorari Denied Oct. 28, 1968.

See 89 S.Ct. 253.

See also, D.C., 274 F.Supp. 805.

Curtiss K. Thompson, New Haven, Conn., for defendants-appellants.

Jon O. Newman (U. S. Atty. for the District of Connecticut, Hartford, Conn.), for plaintiff-appellee.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Walter P. Mackiewicz and his wife, Florence Mackiewicz, were convicted before a jury of income tax evasion on their joint returns for the years 1960, 1961, 1962 and 1963. Int.Rev.Code of 1954, § 7201. To establish unreported taxable income, the Government relied on the net worth and expenditure method. This is a technique whereby the annual increment in asset value is compared to the reported income. The Government contends that there was a discrepancy; that the Mackiewiczes understated their grocery store revenue in their receipt books by about $400 a week; and that over the period involved there was unreported income of some $20,000 a year for a total of approximately $84,000. By way of defense, Mr. Mackiewicz claimed that the excess arose from a cash hoard, black marketeering overseas, success with dice on his troop ship coming home, gambling at casinos and repayments of loans by relations and associates. The jury apparently rejected these explanations. Both Mr. and Mrs. Mackiewicz appeal. The appellate issues before us do not concern the facts as such but the methods used by Internal Revenue Agents to obtain these facts. See discussion in 274 F.Supp. 805, U.S.D.C.D.Conn.1967.

I.

Mr. Mackiewicz owned a small grocery store which he and his wife managed. The work was divided between them, although there was evidence that the majority of the entries in the receipt books were made by Mrs. Mackiewicz.

In November, 1964, Agent Gardner (of the Audit Division of the Internal Revenue Service) began an audit of their joint returns. To assist him, Mr. Mackiewicz retained an accountant, Mr. Minella, and he turned over his business and personal records to him. These included the grocery store account books. Moreover, in December, 1964, he asked his wife for her personal records, which she normally kept in a desk drawer. These included savings account books, personal account stubs, personal account records, and a mutual fund document. She willingly gave these papers to her husband, for he often asked for them at income tax time. In fact, Mrs. Mackiewicz never concerned herself with the preparation of their annual joint return. She left the entire matter in the hands of her husband and she merely signed whatever tax papers he presented to her. When she discovered that he had given these personal records to an accountant for the purpose of assisting Agent Gardner, she said nothing.

In the course of his investigation, Agent Gardner ascertained that the Mackiewiczes' deposits exceeded their business income. He therefore referred the case to Special Agent Harden (of the Intelligence Division of the Internal Revenue Service).

On January 12, 1965, the two agents went to the Mackiewiczes' store in order to inverview Mr. Mackiewicz. They were told that he was at a new building site, so they drove there hoping to find him. Mr. Mackiewicz was at the site, and the three arranged to have an interview that very afternoon.

At 1:30, Mr. Mackiewicz invited the agents into his home for the interview. Agent Harden displayed his badge and advised Mr. Mackiewicz that he was making an inquiry into certain tax deficiencies on his and Mrs. Mackiewicz's joint return. He further told Mr. Mackiewicz that he did not have to answer any questions or produce any documents which might incriminate him. The

agent repeated this, and Mr. Mackiewicz indicated, by an affirmative nod, that he understood. The agent never mentioned that Mr. Mackiewicz could call an attorney.

Agent Harden then proceeded to ask Mr. Mackiewicz a series of questions, taken from a lengthy questionnaire supplied him by the Internal Revenue Service for use in investigating a taxpayer suspected of fraud. Many of the questions were designed to enable the ägent to fashion a net worth theory of evasion. Since he was ignorant of this theory, Mr. Mackiewicz did not understand the potential import of the questions.

Mr. Mackiewicz answered, in a very responsive and cooperative manner, most of the questions. Moreover, at the request of the agents, he took them to the bank and allowed the agents to inventory the materials in the safe deposit box which he and his wife owned jointly. It included several bonds, stock certificates and some cash. Mr. Mackiewicz also instructed Mr. Minella to permit Agent Harden to examine all the family business and personal records. Mrs. Mackiewicz was not present at the interview, nor was she aware that her husband was showing their private papers to the agents.

## II.

■ Mr. Mackiewicz claims that his constitutional rights were violated under the Fourth [e.g., United States v. Blalock, 255 F.Supp. 268 (E.D.Pa.1966); 67 Colum.L.Rev. 130 (1967)], Fifth [Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], and Sixth [Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)] Amendments for at the January 12, 1965 interview he was not told of his rights as enunciated in *Miranda*. However, we believe that *Miranda* does not apply in the circumstances of this case and that Mr. Mackiewicz unequivocally, specifically and intelligently,

United States v. Smith, 308 F.2d 657, 663 (2 Cir.1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963), consented to answer the questions and to the asserted search and seizure of the documents.

Mr. Mackiewicz contends that on January 12th the inquiry as to his tax deficiencies had shifted from the investigatory to the accusatory stages, Escobedo v. State of Illinois, supra, 378 U.S. at 492, 84 S.Ct. 1758, and that the conduct of the agents established an atmosphere of custodial interrogation, Miranda v. State of Arizona, supra, 384 U.S. at 444, 86 S.Ct. 1602. Reliance is placed on the following facts: (1) The civil investigator had referred the case to a Special Agent. This is done when there are "definite indications of fraud or criminal potential." Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (dissenting opinion); Turzynski v. United States, 268 F.Supp. 847 (N.D.Ill.1967). (2) The agents' actions established an atmosphere of urgency. Moreover, they displayed their authority in such a manner as to put Mr. Mackiewicz on the defensive. He claims that he felt it was not merely an interview, but an inquisition in which he knew that he was faced by representatives of the Government who could demand, if necessary, an inspection of his records, documents, and papers. Int.Rev. Code of 1954, § 7602. Mr. Mackiewicz claims that although not technically under arrest, he felt constrained to cooperate. (3) The asking of apparently innocuous questions was "insidious and dishonest," Turzynski v. United States, supra, at 851, for Mr. Mackiewicz claims that he had no way of knowing that these questions might later incriminate him. He didn't know of the net worth theory of proving income, and it is probable that even if he had, he would have been unable to imagine how the questions and answers could be used to build the Government's case. Thus, he was tricked into supplying the Government with the

incriminating evidence. As one experienced tax attorney has said:

"The agents are understandably circumspect in their questioning of the taxpayer. Early in their careers, they have learned that it is easier to catch flies with molasses than with vinegar. They do not wish to antagonize the taxpayer or alarm him unduly * * For all these reasons they are pleasant in their relationship with the taxpayer, they do not confront him with incriminating evidence, and he is often lulled into a false sense of security." Avakian, "Rights and Remedies of Taxpayers Suspected of Fraud," 33 Taxes 878, 879–880 (1955).

We are aware that in certain circumstances administrative investigators may infringe upon a private citizen's constitutional rights. However, in this case, the circumstances were such that it was unnecessary for the agents to supply Mr. Mackiewicz with the full-blown *Miranda* warnings. To some extent, a taxpayer must watch out for himself. Morgan v. United States, 377 F.2d 507, 508 (1 Cir. 1967). This is such a case.

Thousands of inquiries are made annually by our tax investigators. They must be carried off with some dispatch and efficiency. To inject the full *Miranda* warning at this stage of the proceedings would merely clutter an already difficult administrative task. Furthermore, if *Miranda* warnings were required, the Service might have to supply financially indigent taxpayers with attorneys to assist and advise them. Morgan v. United States, supra, at 507. This obviously would hinder the efficient collection of our taxes.

The prevention of dilatory behavior and administrative overload is an important interest. In United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the Supreme Court held that the Internal Revenue Service does not have to show probable cause for a subpoena; it based its decision, *inter alia*, on the danger of increased dilatory action by taxpayers and the increase in the administrative load. These considerations are equally valid here.

More specifically (in response to Mr. Mackiewicz's contentions), we do not believe that the mere referral of a case to a Special Agent changes the focus of the case enough to generate the necessity of *Miranda* warnings. Although a few cases have argued that this referral is a decisive step, Turzynski v. United States, supra, the Supreme Court has indicated that the process is more gradual. In Mathis v. United States, supra, the Court held that under the circumstances of that case, the taxpayer was entitled to *Miranda* warnings as early as the routine tax investigation by a civil agent. It thus rejected any formalistic reliance on the official title of the investigator. As the Court said at 4 of 391 U.S., at 1505 of 88 S.Ct.: " * * * there [is] always the possibility during his investigation that his work would end up in a criminal prosecution." To draw a precise line would discourage the Service from having any special investigators and it would encourage civil investigators to expand their inquiries. 33 U.Chi.L.Rev. 134, 147–148 (1965). Furthermore, regardless of the official title of the agent, it would be administratively impossible for the Service to forewarn a taxpayer every time its suspicions, based on changing evaluations of the changing evidence, shifted.

Secondly, we do not believe that the atmosphere was so charged that it was tantamount to an actual in-custody investigation. We base our decision, not on a technical and unrealistic view of the custody requirement, Mathis v. United States, supra, but on the totality of the circumstances present at the interview. There was little that was hostile or inherently coercive here. The taxpayer had the interview in his own home. Schlinsky v. United States, 379 F.2d 735 (1 Cir.), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967). He was free to come and go as

he wished. He was free to ask the agents to leave. To hold this atmosphere coercive would be equivalent to holding all interviews between an individual and a Government agent coercive. Frohmann v. United States, 380 F.2d 832 (8 Cir.), cert. denied, 389 U.S. 976, 88 S.Ct. 478, 19 L.Ed.2d 469 (1967); see generally, Mertens, Federal Income Taxation § 55A.21.

Thirdly, we do not think that the agents' actions were insidious and dishonest. Most frequently, an agent is never sure of the theory he is developing until the facts have been discovered. Therefore, the fact that he has not explained the thrust of his questions to the taxpayer does not necessarily bear on his motive and intent. And in this case, there is no evidence that the agents acted dishonestly.

■ Thus, this is a case where Mr. Mackiewicz's claim rests fundamentally on his own awareness of the possible significance of the questions and answers. However, the ignorance of a person being interviewed by Government agents will not always support the conclusion that he must be given *Miranda* warnings. Such a rule would be too illusory to form a rational and practical basis for administrative action. Where there are no other coercive, extraneous factors, evidence voluntarily given should not be suppressed. United States v. Mancuso, 378 F.2d 612 (4 Cir.1967).

■ Mr. Mackiewicz argues further that even if the full *Miranda* warnings need not be given, the partial warnings actually given in this case were misleading. He claims that in telling him that he need not answer questions which might incriminate him, the agents implied that he had to answer all other questions. This was particularly unfair here, he argues, if viewed from the perspective of a taxpayer unaware that these were criminal investigations and that answers to the apparently innocent questions could later incriminate him. We disagree.

Parenthetically we note that there was no proof that the agents intended to mislead Mr. Mackiewicz. Furthermore, the warnings given do not necessarily convey the implications asserted by him. A reasonable interpretation of the warning would be exactly what it says. Thus, since the full *Miranda* warnings were unnecessary, this partial advice, offered without proof of a dishonest intent, was not so misleading as to be unfair to the defendant.

■ Finally, we conclude that Mr. Mackiewicz knowingly and intelligently waived whatever rights he had. He indicated that he understood the warning the agents gave him. His answers to the questions asked him were responsive and he cooperated in every way possible. He actively assisted the agents by giving them the family records in the safe deposit box and in the hands of the accountant. Under these circumstances, we believe that he unequivocally and freely consented to the searches and seizures and he intelligently and knowingly agreed to answer the agents' questions.

### III.

■ Even if we should find that the Service did not violate Mr. Mackiewicz's constitutional rights (as we have), Mrs. Mackiewicz contends that the search of the jointly held safe deposit box and the seizure of her records (which she had given to her husband) infringed on and violated her Fourth Amendment rights. In essence, she claims that a personal, direct waiver is necessary and, since she did not explicitly authorize her husband's consent or the agents' actions, there was no relinquishment of her rights.

The Fourth Amendment was originally based on a property concept, 79 Harv.L.Rev. 1513, 1516 (1966), and therefore many courts, adopting this premise, have held that a search and a seizure is reasonable if the party in possession and control of the property consents. Mascolo, "Inter Spousal Consent

to Unreasonable Searches and Seizures," 40 Conn.Bar Journal, 351, 397 n. 118. However, over the years the concept has developed into a personal privilege. As Justice Bradley said in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886):

> "The principles laid down in this opinion affect the very essence of constitutional liberty and security * * * they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where the right has not been forfeited * *."

More recently, in Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1963), the Court held that a hotel clerk could not consent to a search of a tenant's room. The Court said at 489: "It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent." Furthermore, no "strained application of the law of agency" was to be permitted.

However, in this case, the circumstances of the joint possession and control, the particular relationship of the Mackiewiczes in respect to tax matters, and the nature of the Service's investigation all establish an agency relationship sufficient to make Mr. Mackiewicz competent to waive his wife's privilege, thereby making the search and seizure reasonable as to her. Sartain v. United States, 303 F.2d 859 (9 Cir.), cert. denied, 371 U.S. 894, 83 S.Ct. 194, 9 L.Ed. 2d 127 (1962); United States v. Eldridge, 302 F.2d 463 (4 Cir.1962).

First, Mrs. Mackiewicz had given her personal records to her husband for tax purposes. He had free access to the safe deposit box for the same reason. In the past, Mrs. Mackiewicz had never objected when he had used this privilege to examine the contents of the box or even pass her papers to another person for the purposes of preparing tax returns. In fact, in this instance she made no objection when she discovered that her husband had turned the papers over to the accountant. With this background, the possession of the papers and access to the box support the inference that he had the power, not to do with the papers what he willed, but to act reasonably with them in respect to tax matters.

Second, Mrs. Mackiewicz had traditionally left the preparation of the tax returns to her husband. She had nothing to do with them, other than signing her name. Thus, he was her agent for tax matters. Although one commentator has suggested that a wife would never make her spouse her agent to disclose incriminating evidence, 67 Colum.L.Rev. 130, 147 (1967), this is unrealistic. Mr. Mackiewicz was his wife's agent in this field in January, 1965, for better or worse, no matter where this agency might lead. It wasn't until long after the interview that Mrs. Mackiewicz attempted to sever this authority.

Third, if viewed from the Service's perspective (and in determining reasonableness this is necessary), the agents were making an investigation of a joint return. Therefore, from their standpoint, it was natural to seek the person who in fact completed the form and direct their questions to him. This Court has in fact gone so far as to hold that if there is joint criminal activity by a married couple, the less dominant partner (in a particular matter) can consent to a search of their property. United States v. Pugliese, 153 F.2d 497 (2 Cir.1945). Moreover, since Mr. Mackiewicz could have expected to be as guilty as his wife of any fraud, there was no reason for the agents to suspect that he would be cavalier with his wife's property and rights. This is not a situation where the police convinced an innocent wife to allow a search of her criminal husband's property. State v. Coolidge, 106 N.H. 186, 208 A.2d 322 (1965).

## IV.

Mrs. Mackiewicz further contends that her common law marital privilege was violated when Agent Harden testified as to certain financial facts told to him by her husband at the January 12, 1965 interview.

" * * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience." F.R.Crim.P. 26.

At common law, the husband and wife were disqualified from testifying in a law suit in which his (or her) spouse was a party. This rule was based on three distinct principles: (1) the incompetency of the spouse to testify for the other; (2) the incompetency of the spouse to testify as to confidential information; and (3) the incompetency of either spouse to testify against the other.

Principle (1) was rejected in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933), in which the Court recognized that this aspect of the rule was based on the universally ignored common law rule of disqualifying interested witnesses. Therefore, the rule was no longer needed.

Principle (2) is still vital, McCormick, Evidence, §§ 83, 84, but inapposite in this case. The facts related to the agent were of a financial nature, referring to the income and assets of the marriage. They were not confidential, and they were never meant to be confidential. United States v. Ashby, 245 F.2d 684 (5 Cir.1957).

Thus, it is only principle (3) which may be applicable. In Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), the Court held that a wife, although willing to testify, could not testify against her husband. As Justice Black said at 77, 79 S.Ct. at 138:

"The basic reason the law has refused to pit wife against husband or husband against wife in a trial where life and liberty is at stake was a belief that such a policy was necessary to foster family peace, not only for the benefit of husband, wife, and children, but for the benefit of the public as well."

The question here presents a variation of the *Hawkins* rule. May a husband's voluntary out-of-court statements, made when acting as agent for his wife, be repeated by a third person and used against his wife at a joint trial in which neither spouse consents to their use? Under these circumstances, we think so, for (a) since the statements were not actually testified to by the husband at trial, they did not jeopardize domestic peace, (b) since Mr. Mackiewicz testified, the danger of prejudicial hearsay is greatly reduced, and (c) the statements were made voluntarily when Mr. Mackiewicz was an implied agent for his wife.

This is not a case where the prosecution called the husband to the stand. If he had testified under those circumstances, the common law rule would have been violated. Here, however, we are one step removed from actual testimony. Therefore, there is no chance that we might be repulsed by a spouse actually testifying against his mate, see McCormick, Evidence, § 66. Nor is there a chance that marital frictions will be aggravated, 33 Tul.L.Rev. 884, 890–892 (1959), for there is the convenient buffer of the third person actually making the remarks. United States v. Winfree, 170 F.Supp. 659 (E.D.Pa.1959); contra, Peek v. United States, 321 F.2d 934 (9 Cir.1963), cert. denied, 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964) (dictum); Olender v. United States, 210 F.2d 795 (9 Cir.1954), cert. denied, 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957) (dictum).

Mrs. Mackiewicz further contends that since these are out-of-court statements, they are hearsay. 8 Wigmore, Evidence § 2232 (McNaughton Rev.1961). However, the danger of hearsay statements is that the defendant does not have the

opportunity to cross-examine the declarant. In this case, Mr. Mackiewicz took the stand, and therefore, if his wife had wanted to, she could have cross-examined him.

Furthermore, Mr. Mackiewicz had the implied authority of his wife to make the statements. As has been noted above, he was the implied agent for the family business in tax matters. Moreover, since they were partners in the income tax evasion, the statements are admissible under a standard exception to the hearsay rule. United States v. Pugliese, supra; People v. Williams, 6 Ill. App.2d 325, 127 N.E.2d 505 (1955). This exception is applicable if there is simply a "likelihood of an illicit association." United States v. Ragland, 375 F. 2d 471 (2 Cir.1967). This was established when the Court had reason to suspect tax fraud on the joint returns.

Finally, this is not a case where a wife purposefully makes an incriminating statement against her husband. United States v. Ashby, supra (the statement was admitted in that case, for by the time of trial the couple was divorced). Rather, Mr. Mackiewicz, being a potential defendant at the time he answered the questions, had nothing to gain by revealing facts which would do harm to his wife.

Affirmed.

FEINBERG, Circuit Judge (concurring):

I join in the majority opinion, but as to Part II thereof, I concur because the way I read *Miranda* I do not believe that it applies to a situation with as few custodial aspects as this one, as my brother Moore has ably pointed out. However, if this analysis of *Miranda* is incorrect, and full warnings are required when an investigation has been referred to a special agent of the Intelligence Division of the Internal Revenue Service, I do not agree that this limited extension of *Miranda* will necessarily cause serious administrative difficulties.