**UNITED STATES of America,**
**Appellee,**

v.

**Enrico SQUERI, Appellant.**

**No. 348, Docket 31959.**

United States Court of Appeals
Second Circuit.

Argued March 18, 1968.

Decided July 24, 1968.

---

Frederick F. Greenman, Jr., Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York and Douglas S. Liebhafsky, Asst. U. S. Atty., on the brief), for appellee.

Harry J. Halperin, New York City (Halperin, Shivitz, Scholer & Steingut, New York City, on the brief), Fred J. Carusona, James D. Walsh, Peter A. Eisenberg, New York City, of counsel, for appellant.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge and CLARIE,* District Judge.

LUMBARD, Chief Judge:

This appeal by Enrico Squeri from a judgment of conviction, after a non-jury trial before Judge Murphy in the Southern District in August 1967, on four counts of wilfully attempting to evade income taxes of over $100,000 extending over four tax years, presents the sole question whether the court below erred in denying appellant's motion to suppress certain records which he had delivered

* Of the District of Connecticut, sitting by designation.

to the Internal Revenue Service during an audit of his returns. Appellant moved before trial to suppress the records, contending that they were obtained in violation of his constitutional rights because the IRS agents had misrepresented the nature and purpose of the investigation and because the agents had not informed him of his right to counsel. After a lengthy pre-trial hearing before Judge Cooper, the motion was denied, the court finding that there had been no misrepresentation by the IRS agents and that the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not applicable to this case. Objection to this evidence was renewed at trial and overruled by Judge Murphy. We agree with the ruling of the district court and affirm the judgment of conviction and sentence of two years, suspended, with probation for one year, and a fine of $40,000.

The circumstances relating to the production of the records are somewhat unusual; the audit of appellant's returns was originally undertaken in connection with an investigation which was directed not at the appellant, but at the possible criminal activities of another person wholly unrelated to the tax evasion involved in the present prosecution.

In 1962 the IRS commenced an investigation of Peter J. Riordan, a former Internal Revenue Agent, suspected of improper dealings with various taxpayers, including the preparation of tax returns. A group of agents, consisting of both Internal Revenue Agents and Special Agents, was assigned to investigate some 50 to 75 taxpayers thought to have dealt with Riordan, including Squeri who owned and ran a restaurant which Riordan was known to frequent. According to the government, the Internal Revenue Agents were to conduct regular audits of the taxpayers' returns for the years 1959 to 1961; the Special Agents were to determine if Riordan had prepared any of the returns and, if so, whether he was responsible for any false entries which the audits might reveal.

In April 1963 two Special Agents visited Squeri to obtain a waiver of the civil statute of limitations on the 1959 returns, which was about to expire. Squeri consulted Hugo Poltronieri, the accountant who prepared his tax returns, who informed Squeri that Special Agents were usually called in criminal cases. Poltronieri advised Squeri to get a lawyer if he was involved in any trouble. Squeri said he had nothing to hide and apparently did not consult a lawyer at that time. He then signed and returned the waiver.

On October 8, 1963, the IRS wrote Squeri requesting him to come for an interview and to bring any records used in preparing his returns, including any savings bank books. On October 16 Squeri, accompanied by Poltronieri, arrived at the IRS office at 50 Church Street, where he was met by Internal Revenue Agent Frank Rojek and Special Agent Robert G. Ganley. Ganley explained to Squeri that he was investigating Riordan and that he wanted to question Squeri as to his relationship with Riordan. Ganley warned Squeri that he had a right not to answer any question or to make any statement which would tend to incriminate him; he added that Rojek would later conduct an audit of Squeri's books and records.

Ganley then questioned Squeri about Riordan. Squeri's answers revealed that he had never had any connection with Riordan with regard to any tax matters, and Squeri then signed an affidavit to this effect. During Ganley's questioning, Rojek asked Squeri if he had brought the documents requested in the letter. Squeri then handed over 13 savings passbooks, which Poltronieri had not known of when preparing the returns and which were subsequently found to reflect income not included in the returns. At the end of the meeting Rojek told Squeri that he wanted to continue the audit, to which Squeri consented.

As a result of Ganley's questioning, Squeri was cleared of any improper connection with Riordan and was dropped from the Riordan investigation. How-

ever, Rojek proceeded with the audit. On October 30, Rojek went to Squeri's home to examine his records for 1959–1961. Squeri showed Rojek the records and said that they were at his disposal. Rojek returned the following day and on three further occasions—November 14 and December 13, 1963; and April 15, 1964. Squeri permitted Rojek to examine the records and himself produced some further records, including those for the additional year 1962, requested by Rojek. In June 1964, Rojek concluded that there was an indication of fraud, and Special Agent Howard English was then assigned to determine if criminal charges were warranted. With Squeri's knowledge, Poltronieri turned over to English certain of the records for 1959 to 1962 which Rojek had previously examined. Subsequently, Poltronieri turned over at Rojek's request other records, for the years 1955–1958; these records do not relate to the present criminal case, which involves only the years 1959–1962.

In October 1964 English decided that there was enough evidence to give serious consideration to prosecution, and a letter was sent to Squeri informing him of this and proposing a conference on the subject. At this point, apparently, Squeri retained a lawyer. The conference with Squeri and his counsel, Mr. Halperin, was held on December 1, 1964, and in February 1965 the IRS recommended prosecution.

Upon this evidence the district court rejected Squeri's claim that the IRS had obtained the records by resort to deceit and misrepresentation. The court found that, while criminal proceedings were contemplated from the outset with respect to Riordan, the audit of Squeri's returns was routine and civil; that the IRS had put Squeri on notice as to the nature and scope of its inquiry; that Squeri had comprehended every phase of the matter; and that he had cooperated with the IRS and had voluntarily turned over the records, with full knowledge of the purposes of the investigation. The court stated that while the routine audit of defendant's returns eventually

revealed information which formed the basis upon which the indictment rested, when that time arrived no impermissible advantage was practiced, directly or indirectly, by the IRS upon the defendant. These findings are amply supported by the record.

▪ Squeri was admittedly advised that his returns were being audited and that the IRS was investigating Riordan's activities. This gave Squeri full and accurate information as to the extent of the IRS inquiry. The failure to advise Squeri of possible criminal proceedings against himself was not misleading, since the district court found, on sufficient evidence, that no such proceedings against Squeri were contemplated at that time.

▪ Furthermore, even if the IRS had contemplated criminal proceedings against Squeri, there would be no merit to the claim of deception; the information that a taxpayer's returns are under audit gives sufficient notice of the possibility of criminal prosecution regardless of whether the agents contemplate civil or criminal action when they speak to him. E. g., United States v. Sclafani, 265 F.2d 408, 414–415 (2d Cir.), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L. Ed.2d 1534 (1959); Russo v. United States, 241 F.2d 285 (2d Cir. 1957). Moreover, Squeri was warned of his right not to incriminate himself, and there is no force to his contention that this warning could have been taken as applying only to the questions asked by Ganley and not those asked by Rojek.

Appellant also argues that his constitutional rights were violated when he was not informed of his right to counsel at the first meeting with Rojek and Ganley on October 16, 1963.

In Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a suspect must be warned of certain rights, including his right to counsel, before being subjected to custodial interrogation. This requirement was imposed because of the compelling atmosphere inherent in the process of in custody questioning, which the court discussed at length, 384

U.S. at 445–458, 86 S.Ct. 1602; the court reasoned that "adequate protective devices such as explicit warnings" were necessary "to dispel the compulsion inherent in custodial surroundings," and thereby ensure compliance with the Fifth Amendment prohibition against compelling a person to incriminate himself. 384 U.S. at 458, 467, 86 S.Ct. at 1619.

■ The Supreme Court recently held that the *Miranda* warnings were required where the defendant had been questioned by IRS agents, as part of a routine tax inquiry, while he was in state custody on an unrelated charge. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (May 6, 1968). The court's opinion makes clear, as did the opinion in *Miranda*, that it is the custodial surroundings in which the questioning was conducted which creates the necessity for the warnings.

This rationale is relevant only where the questioning is conducted in custody or in circumstances which are similarly inherently compelling; it does not apply to questioning under other circumstances in which there are no inherently compulsive pressures to be overcome.

■ In the present case, Squeri's presence at the October 16 interview in the Internal Revenue office was entirely voluntary; he was not in custody and his freedom of action was not in any way impaired. Furthermore, the entire interview was conducted in the presence of Poltronieri, who at Squeri's request had accompanied him to the meeting. These circumstances present none of the inherently compulsive aspects which the Supreme Court found to exist in the process of custodial interrogation, and therefore the reasoning of *Miranda* and *Mathis* does not apply to the present case. United States v. Mackiewicz, 2d Cir., 401 F.2d 219, July 10, 1968.

We do not believe that the requirement of a warning of right to counsel, necessary to prevent compulsion where the person questioned is in custody or otherwise deprived of his freedom of action in any significant way, extends to all other instances of government questioning. As we pointed out in United States v. Mackiewicz, supra, application of the full Miranda requirements to noncustodial questioning conducted during the initial stages of a tax inquiry, or other routine government inquiry, would impede an already difficult administrative task and seriously hinder the efficiency with which that task is carried out. In Morgan v. United States, 377 F.2d 507 (1st Cir. 1967), rejecting the contention that IRS agents at a routine interview were required to warn the taxpayer of the right to counsel, Chief Judge Aldrich pointed out how impossible customary government operations might become if *Miranda* warnings were to be required in such situations, stating:

"There must be reasonable limits to the solicitude required of the government. Defendant would have it appear that it would have been a simple matter to have informed him that he was entitled to counsel. This, however, is no easy solution to what, if the defendant is correct, is a very far reaching question. If the government were obliged to inform a defendant that he was entitled to counsel, presumably it would equally be obliged to supply one if he was financially disabled.

"In a Miranda situation there may be thought to be a very real need for counsel. But to say that a government agency must be prepared to suggest, and perhaps supply, counsel at every turn that it asks questions of someone, in addition to advising that there is no need to answer and warning of the possibility of self incrimination, we think goes far beyond any principle of fundamental fairness, and would be an uncalled-for departure. To some extent persons must be prepared to look after themselves." 377 F.2d at 508.

The view that the *Miranda* requirements do not apply to noncustodial questioning by IRS agents has been adopted by every Court of Appeals which has passed on this question and by a majority of the District Courts which have done so. United States v. Mackiewicz, supra; Morgan v. United States, supra; Schlinsky v. United States, 379 F.2d 735 (1st

Cir.), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967); Spinney v. United States, 385 F.2d 908 (1st Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); United States v. Maius, 378 F.2d 716 (6th Cir.), cert. denied, 389 U.S. 905, 88 S.Ct. 216, 19 L.Ed.2d 219 (1967); Selinger v. Bigler, 377 F.2d 542 (9th Cir.), cert. denied, 389 U.S. 904, 88 S.Ct. 212, 19 L.Ed.2d 218 (1967); Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965), cert. denied, 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966); Rickey v. United States, 360 F.2d 32 (9th Cir.) cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed. 2d 69 (1966); United States v. Gleason, 265 F.Supp. 880 (S.D.N.Y.1967); United States v. Bachman, 267 F.Supp. 593 (W. D.Pa.1966); United States v. Kubik, 266 F.Supp. 501 (S.D.Iowa 1967); United States v. Jaskiewicz, 278 F.Supp. 525, 534 E.D.Pa.1968); and see cases cited in Frohmann v. United States, 380 F.2d 832, 836 (8th Cir. 1967).

Thus we reject the view, adopted by a few district courts in other circuits, that IRS agents must give the *Miranda* warnings, even though there is no custodial interrogation, if the investigation has reached the accusatory stage. United States v. Turzynski, 268 F.Supp. 847 (N.D.Ill.1967); United States v. Kingry, 19 Am.Fed.Tax R.2d 762 (N.D.Fla.1967); United States v. Schoenburg, 19 Am.Fed.Tax R.2d 348 (D. Ariz.1966); United States v. Wainwright, 284 F.Supp. 729, D.Colo., March 11, 1968. The Fifth Amendment privilege prohibits the government from *compelling* a person to incriminate himself. It was the compulsive aspect of custodial

interrogation, and not the strength or extent of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning. We believe that the presence or absence of compelling pressures, rather than the stage to which the government's investigation has developed, determines whether the *Miranda* requirements apply to any particular instance of questioning.[1]

In any event, even under the view that the *Miranda* warnings must be given when the investigation reaches the accusatory stage, Squeri has not shown that he was entitled to such warnings at the October 16 meeting. At that time no criminal proceedings were contemplated with respect to Squeri, and the investigation had not reached the accusatory stage with respect to him. While the investigation did contemplate criminal proceedings with regard to Riordan's activities, this was "accusatory" as to Riordan, not as to Squeri. The district court found, on sufficient evidence, that the audit was routine and civil, and the books and records produced prior to July 1964 were in response to routine audit requests. True the audit eventually revealed, as any audit might, that the taxpayer's income had been understated. However, the only records relevant to this prosecution which were turned over after the IRS had tentatively concluded in July 1964 that Squeri had engaged in criminal understatement of income were records which Squeri had previously produced for examination by Rojek.

Affirmed.

---

[1] In *Miranda*, the court explained its prior decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as resting on the basis of the compelling atmosphere of the in-custody interrogation and on the importance of presence of counsel as a means of overcoming that inherent compulsiveness. 384 U.S. at 442, 465–466, 86 S.Ct. 1602. The court explained that custodial interrogation "is what we meant in Escobedo, when we spoke of an investigation which had focused on an accused." 384 U.S. at 444, n. 4, 86 S.Ct. at 1612. That the determinative factor is whether the interrogation was custodial, rather than the degree of the government's suspicions, is clearly shown by Mathis v. United States, 391 U.S. 1, 88 1968, where the court held that the IRS agents were required to give *Miranda* warnings to a defendant who was in state custody on an unrelated charge at the time of the interview, even though the interview was merely the initial stage of a routine inquiry by civil agents.