**UNITED STATES of America,**
**Appellee,**

v.

**Richard V. CAIELLO, Appellant.**

**No. 212, Docket 33175.**

United States Court of Appeals
Second Circuit.

Argued Oct. 28, 1969.

Decided Dec. 31, 1969.

Certiorari Denied April 20, 1970.
See 90 S.Ct. 1358.

---

James P. Shanahan, Asst. U. S. Atty. (James M. Sullivan, U. S. Atty. for Northern District of New York, on the brief), for appellee.

Phillip Pinsky, Syracuse, N. Y. (Pinsky, Canter & Pinsky, Syracuse, N. Y., on the brief), for appellant.

Before LUMBARD, Chief Judge, and MEDINA and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

Richard V. Caiello appeals from his conviction on three counts of willfully attempting to evade joint income tax liability in the years 1960, 1961, and 1962 in violation of 26 U.S.C. section 7201. The appeal raises the now familiar question of whether statements and records of a taxpayer under investigation by revenue agents and special agents of the Internal Revenue Service (IRS) may be received in evidence where the taxpayer has not been given the so-called *Miranda* warnings. All but one of the circuits which have considered this question have repeatedly held that such warnings are not required.[1] A divided panel of the Seventh Circuit recently held that such warnings "must be given to the taxpayer by either the revenue agent or the special agent at the inception of the first contact with the taxpayer after the case has been transferred to the Intelligence Division [of the IRS]." United States v. Dickerson, 413 F.2d 1111, 1116–1117 (7th Cir. 1969) (footnotes omitted).[2] We reject the reasoning of the majority opinion in *Dickerson* and affirm the conviction on the authority of our long line of cases refusing to require such warnings, the latest of which is United States

---

1. See cases cited in United States v. White, 417 F.2d 89, 91 (2d Cir. Oct. 10, 1969), and in Cohen v. United States, 405 F.2d 34, 37–38 n. 7 (8th Cir. 1968).

2. As the Seventh Circuit stated in *Dickerson*, the "jurisdiction of the Intelligence Division is limited to criminal investigations." 413 F.2d at 1112–1113. However, the *Dickerson* holding would permit a revenue agent to testify about statements made or records produced by the taxpayer during the process of audit prior to referral to the Intelligence Division, even though no warnings were given. Thus, the thrust of the decision could be avoided by simply expanding the scope of the pre-referral audit, since both revenue agents and the special agents of the Intelligence Division peruse essentially the same records and make essentially the same calculations.

v. White, 417 F.2d 89 (2d Cir. Oct. 10, 1969).

When considering whether warnings about Fifth and Sixth Amendment rights should be given during tax investigations which may lead to criminal prosecution, most courts of appeal have examined the facts surrounding the IRS interviews on a case-by-case basis to determine whether they presented the inherently compulsive aspects which the Supreme Court found to exist in the process of custodial interrogation in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), and later in Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L. Ed.2d 381 (1968). See e. g., United States v. Squeri, 398 F.2d 785, 789–790 (2d Cir. 1968); United States v. Mackiewicz, 401 F.2d 219, 222–223 (2d Cir. 1968). As we stated in Squeri, supra, 398 F.2d at 790:

> The Fifth Amendment privilege prohibits the government from compelling a person to incriminate himself. It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the Miranda requirements with regard to custodial questioning. We believe that the presence or absence of compelling pressures, rather than the stage to which the government's investigation has developed, determines whether the Miranda requirements apply to any particular instance of questioning.

■ The testimony shows that at no time prior to the "formal interview" with the taxpayer did either of the IRS agents conducting the investigation specifically warn Caiello that he could refuse to answer their questions or produce records, that anything he said could be used against him in a criminal prosecution, or that he had a right to counsel, retained or appointed. Although many of the cases decided in this and other circuits have mentioned the fact that taxpayers undergoing audit were informed of some or all of their rights at some point during a long investigation, see e. g. Squeri, supra, 398 F.2d at 788, this factor has not been regarded as crucial.[3] Appellant contends that the complete absence of warnings in the present case distinguishes our previous decisions. We disagree. The fact that IRS agents sometimes give a partial warning at one or even several interviews during a protracted investigation does not mean that warnings of some kind are or should be required. Rather, proof that some warnings were given, or that none were given, merely serves as evidence bearing on the question of whether the questioning was noncoercive.

The substance of our prior decisions is that if the taxpayer is aware that he is the subject of a tax investigation and if he is interviewed in noncustodial situations, Miranda warnings are not required. The rationale is that once the taxpayer is aware that agents of the IRS are conducting a serious inquiry into his income tax liability and the agents do not conduct their investigation in a manner which is inherently coercive it is not improper to expect that "[t]o some extent persons must be prepared to look after themselves." Morgan v. United States, 377 F.2d 507, 508 (1st Cir. 1967). In the present case, there can be no question that the IRS investigation satisfied both the conditions described above.

■ Caiello made a timely motion to suppress statements and records given by him to several IRS agents. Judge Port held a pretrial hearing and denied the motion; the objections were renewed

---

3. In our latest pertinent decision, we noted that the "Special Agent admonished [the taxpayer] that he was not required to answer any questions or turn over any personal records but did not state specifically that anything he said might be used against him in a criminal prosecution." White, supra, 417 F.2d at 91. In addition, the court pointed out that no warnings about the right to counsel were given.

at trial, and testimony about Caiello's statements and copies of many of his records were introduced in evidence over those objections. Thus, Judge Port found that Caiello had not discharged his burden of showing that the circumstances surrounding his contacts with the IRS were so coercive as to require the giving of warnings. Upon review of the record, we agree that this burden was not met.

The transcript of the suppression hearing shows that Caiello was contacted more than twenty times by revenue agent George Kowitt and special agent Michael Wilton, either together or separately.[4] There can be no doubt that the statements and records furnished by Caiello were important, for the government used the net worth and expenditure method of establishing unreported income.[5] As noted above, none of the *Miranda* warnings was specifically given.

Caiello was fully aware of what was occurring. The initial face-to-face meeting between Caiello and Kowitt, the first IRS man to contact him, took place on June 3, 1964, in the office of Caiello's bookkeeper Hurley. Caiello himself remained for only fifteen minutes, after delivering some records he had agreed to bring when Kowitt arranged the appointment over the telephone. Kowitt continued his audit at Hurley's office with the records made available to him there. Thus, from the inception of the IRS investigation, both Caiello and his bookkeeper Hurley were fully aware that a tax investigation was underway.[6]

The investigation was referred to the Intelligence Division by Kowitt on August 4, 1964, and special agent Wilton first met with Caiello on August 17, eleven days later. Up to this point, Kowitt had visited Caiello twice after the brief meeting at Hurley's office. Wilton testified that he was introduced to Caiello by Kowitt as a special agent of the Intelligence Division and that he showed Caiello his badge and credentials. On cross-examination at trial, Wilton stated that he told Caiello: "I have been assigned to conduct an investigation of your tax liability." Thus, it was perfectly clear to Caiello that he was the subject of a tax investigation, and an investigation which had more serious aspects by reason of the appearance and formal introduction of a second IRS representative.[7]

The record is also replete with testimony that none of the interviews took place in a custodial setting or were inherently coercive. At the suppression hearing, Caiello was asked several ques-

---

4. A number of these contacts were short telephone calls. Some of these calls were merely to arrange appointments for personal interviews. Other calls involved a few substantive questions about Caiello's business or personal financial affairs. Several phone calls and meetings were devoted primarily to obtaining from Caiello extensions of the statutory time to levy additional assessments of income tax.

5. This is a technique by which IRS agents calculate annual increments in asset value and compare them to reported income. In Caiello's case, for the three years for which he was convicted, the indictment charged that he had understated the income from his grocery store—a sole proprietorship—by a total in excess of $29,000.00.

6. The IRS representatives referred Caiello to Hurley for advice at least once during the investigation. The record shows that on February 9, 1965, agents Kowitt and Wilton met Caiello at his store for the purpose of securing an extension of the period of limitation for the assessment of additional tax. In explaining this procedure to Caiello, Wilton told him that if he did not understand the forms he should take it up with Hurley. The forms were eventually signed on September 21, 1965, and returned to Wilton.

7. Also relevant in this regard is the fact that Caiello admitted on cross examination at the suppression hearing that before the IRS contacted him he had already been audited by tax officials of New York State with regard to payment of state income taxes, and that this investigation had resulted in an additional assessment of between $1400.00 and $1500.00 which he had to pay to the state. That this experience was in Caiello's mind during the IRS investigation is perfectly clear, for Kowitt testified that at one of his early meetings with Caiello, Caiello asked him how the IRS audit was going compared with the state investigation.

475

tions relating to the entire course of his contact with representatives of the IRS prior to the formal interview, which he attended with counsel on January 21, 1966. One set of exchanges is particularly significant:

"Q. Now at any time during the course of your contact with members of the Federal Internal Revenue Service did any of the representatives ever advise you that you were under arrest? A. No.

"Q. Did they ever advise you were in custody? A. No.

"Q. Did they ever advise you that you were not free to leave either your premises or their offices [where the interviews took place] at any time? A. No.

"Q. Was it your feeling during the course of these interviews that you were free to leave at any time? A. Yes."

Moreover, Caiello testified that he often moved away from the IRS representatives who interviewed him in his grocery store to wait on customers or do other work. The agents' testimony, not contradicted by Caiello, was that several times throughout the long period of investigation they asked Caiello if he minded answering questions or producing records; his replies were always to the effect that he did not mind. The most important example of this occurred during the meeting of August 17, 1964, when Kowitt introduced Wilton to Caiello. Wilton asked Caiello if he was willing to submit any of his records to him. Caiello replied that he was and made an appointment with Wilton for August 19, 1964. Wilton returned on that date, with Kowitt, and picked up the records—including cash register tapes and other financial records which the government photocopied and later introduced at trial to

show how they had checked Caiello's annual expenditures against reported income and calculated net worth.[8]

We can see no good reason for requiring government agents to give *Miranda* warnings whenever they deal with a citizen regarding possible tax liabilities under circumstances where the citizen is not under restraint and is at liberty to cooperate or not as he may choose. Every citizen must know and will be deemed to know that he is under an obligation honestly and fully to furnish correct information regarding his income and to pay the taxes which accordingly would be owing to the government. Every citizen also knows that false returns and fraudulent evasion of taxes are criminal offenses in violation of federal laws. So far as the citizen is concerned his duties and obligations and his liabilities for taxes for violation of law are the same regardless of the duties of the particular agents who may be assigned to investigate his returns, tax liabilities, and possible violations of the criminal law. And, of course, where there is no restraint and the contacts of the taxpayer and the agents extend over some period of time, there is ample opportunity for the taxpayer to seek such advice and assistance from third persons as he may desire.[9]

Our examination of the record leaves no doubt that Mr. Caiello was not under any restraint at any time up to the formal interview. His answers and decisions to produce various records were voluntary. Accordingly, Judge Port was correct in denying the motion to suppress the statements and records and in admitting them in evidence over renewed objections at trial.

There is a final matter which merits our attention. On December 16, 1968, Caiello was sentenced to six months in

8. Another example occurred when Kowitt took a verbatim transcript of his questions and Caiello's answers with regard to cash on hand during the years under investigation at an interview in the store on July 22, 1964. After reading the answers back to Caiello, Kowitt testified

that he asked Caiello "if he would object to signing this statement and he said that it was the truth and he had no objection and signed it."

9. See footnote 6, *supra*, and accompanying text.

prison and fined $5000.00 on each of counts 2 and 3 of the indictment, the prison sentences to run concurrently. As to count 4, sentence was suspended and Caiello was placed on probation for three years. The judgment of conviction states:

"Probation to begin upon release from confinement. As a special condition of probation, the defendant is ordered to pay all taxes, penalties and interest on his income taxes for the years, 1961, 1962 and 1963 within ninety days after the amounts are finally fixed."

We construe the second sentence quoted above broadly to mean that probation will begin upon release from confinement and that the condition imposed therein is a condition upon the continuation of probation while Caiello is proceeding with an adjudication of his civil tax liability, the duration of such condition of course not to exceed three years. Moreover, as we read the sentence, the time period in the second quoted sentence for the payment of taxes, penalties, and interest does not begin to run until Caiello has exhausted all judicial as well as administrative procedures in connection with determining the amount of tax due. Cf. *White, supra,* at 94. Undoubtedly the district court did not mean to foreclose any of the defendant's rights to a determination of his civil tax liability. *See* United States v. Taylor, 305 F.2d 183, 187 (4th Cir.), cert. denied 371 U.S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1962), rehearing denied, 371 U.S. 943, 83 S.Ct. 322, 9 L.Ed.2d 277 (1962); United States v. Stoehr, 196 F.2d 276, 33 A.L.R.2d 836 (3rd Cir.), cert. denied Stoehr v. United States, 344 U.S. 826, 73 S.Ct. 28, 97 L. Ed. 643 (1952).

The conviction is affirmed.

FEINBERG, Circuit Judge (concurring):

I concur on the authority of United States v. White, 417 F.2d 89 (2d Cir. Oct. 10, 1969), petition for cert. filed, 38 U.S. L.W. 3212 (U.S. Dec. 1, 1969); United States v. Mackiewicz, 401 F.2d 219 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968), and my concurrence there, 401 F.2d 226; and United States v. Squeri, 398 F.2d 785 (2d Cir. 1968).