**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jane Nadia JIMENEZ, Defendant-Appellee.**

No. 78–1948.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1979.

Decided July 16, 1979.

---

Thomas P. Sullivan, U. S. Atty., Joan Bainbridge Safford, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellant.

Raymond D. Pijon, Chicago, Ill., for defendant-appellee.

Before CUMMINGS and PELL, Circuit Judges, and MORGAN, Chief District Judge.*

* Chief District Judge Robert D. Morgan of the Central District of Illinois is sitting by designation.

PELL, Circuit Judge.

This is an appeal by the Government [1] from a pretrial order of the district court suppressing testimonial evidence in a case in which the defendant is charged with unlawful possession with intent to distribute 1,109.49 grams of a substance containing heroin in violation of 21 U.S.C. § 841(a)(1). The suppressed evidence consisted of a statement made by the defendant shortly after she exited from her car after being stopped by police officers. The statement was made in response to a question by a Government agent and without the benefit of *Miranda* warnings. The legality of the stop and the circumstances in which she made the suppressed statement are critical to our review of the suppression order. Accordingly, we will first recount the facts leading up to and including the stop and questioning.

In December 1976, Drug Enforcement Administration (DEA) agents and Chicago Police officers recovered records of wholesale narcotics transactions in excess of $2 million from a trailer in Oak Lawn, Illinois. The name "Pollo," subsequently determined to be a nickname for Guillermo Jimenez, was found on several of these records. One had on it the name Pollo and a telephone number. Telephone company records showed that number to be subscribed to by an Alicia Jimenez, later determined to be the defendant.

In early 1977, DEA Special Agent Irwin contacted neighbors of the defendant and learned that Guillermo Jimenez lived in the same residence as the defendant. Irwin and other agents then observed the defendant periodically during August, September, and October, 1977. Irwin learned that the defendant drove a 1972 red Toyota with license plates registered to an Alicia Jimenez. During early October 1977, Irwin followed the defendant to the Maribu Club in Chicago which had been the subject of

1. *See* 18 U.S.C. § 3731.

three narcotics investigations over the previous two years. He observed her meet with Anthony Kimas, who was a part owner of the bar and whom Irwin recognized from previous narcotics investigations.

On October 25, 1977, Irwin was on surveillance duty in the vicinity of 4747 West 19th Street, Cicero, Illinois, the residence of Alicia Jimenez. At approximately 5:00 p. m., the defendant left the apartment, entered her 1972 red Toyota and drove to the Town and Country Restaurant on North Avenue, Chicago, followed by Irwin and other officers. Irwin, as well as other agents acting in an undercover capacity, had previously participated in narcotics transactions at that restaurant.

The defendant parked in the northwest portion of the Town and Country parking lot in a spot which had unoccupied parking spaces on either side. She remained in her car. After approximately fifteen minutes, a 1970 gold Oldsmobile, driven by a male who appeared to the agent to be of Mexican ancestry, entered the parking lot and passed through the part of the lot where the defendant was seated in her car. He then exited the lot, reentered and passed through a second and a third time, each time passing the part of the lot where the defendant was parked. Then he reentered the parking lot and parked next to the defendant's car on the passenger side.

The driver got out of his car carrying a brown paper bag approximately 12 × 18 inches with the top crumpled over and entered the passenger side of the defendant's car. A few moments later, he emerged without the brown paper bag. While the driver of the Oldsmobile went back to his car, the defendant walked to the rear of her car, opened the trunk, placed the bag on the left side, and closed the lid. She then returned to her car and left the parking lot almost simultaneously with the departure of the individual who had provided the bag.

Irwin, followed by three other surveillance agents, trailed the defendant for approximately ten miles until she was within a few blocks of her apartment on Cicero Avenue. Irwin then radioed two Chicago

Police officers, riding together in an unmarked car, to stop her car. The officers pulled alongside her car and showed their badges. As she stopped her car, the police officers parked their car in front of her, got out of their car, and moved to the rear of her car. They displayed no weapons. The defendant left her car, walked around the front and made her way along the sidewalk. By this time, Irwin had parked his car about two car lengths behind her car and was walking toward her. He did not display a weapon. Three other surveillance agents parked behind Irwin but remained in their cars. When Irwin was a few feet from her, he displayed his badge and said, "Hi Alicia, what did you place in your trunk?" The defendant replied, "You know what it is." The police officers then retrieved the car keys from her ignition and opened the trunk. Irwin removed the paper bag and examined the contents, consisting of forty-one approximately one-ounce packages of a brown, chunky, powdery substance. This was field tested positive for the presence of an opiate derivative. The defendant was then placed under arrest and her car seized. Throughout this stop and seizure, the defendant never received *Miranda* warnings.

After the suppression hearing, the district court suppressed the defendant's statement, "You know what it is," opining that the Government "has not convinced the Court that the statements elicited from the defendant in this case were not the direct result of physical, psychological, and emotional coercion. . . ." The court, however, denied the defendant's motion to suppress the evidence taken from the defendant's car trunk.

The basic theory of the Government's appeal is that at the time the defendant made the suppressed statement, she was not subjected to a custodial interrogation; that is, she did not make the statement after she was "taken into custody or otherwise deprived of [her] freedom in any significant way," and, therefore, *Miranda* warnings were unnecessary. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d

694 (1966). In response, the defendant contends first that the arrest occurred when her car was stopped, that the stop and arrest were unlawful, and therefore that the fruits of that unlawful conduct, including the statement, were properly suppressed. Next she argues that regardless of when the arrest occurred, she made the suppressed statement in circumstances sufficiently custodial in nature to require *Miranda* warnings.

■ The district court's decision to suppress the statement was not grounded on the defendant's first argument here that the stop and arrest were illegal. That is clear from the district court's refusal to suppress the evidence seized from the defendant's trunk which it would have had to suppress on the same theory. Nevertheless, because we could affirm the district court on different grounds if we so chose, we shall address this argument. The argument is in essence one of probable cause. The defendant contends that the officers did not have probable cause either to stop or arrest her. We disagree. As we view the case, even if the officers did not have probable cause to arrest the defendant before she made the suppressed statement, they clearly had a reasonable suspicion "that criminal activity may be afoot," and thus could legally stop the defendant and make inquiries. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[2] Having legally

stopped her and asked her but one question, she made the suppressed statement which, assuming *arguendo* that probable cause did not already exist, provided the probable cause for the search of her trunk and seizure of the bag and her subsequent arrest.

■ The defendant argues that *Terry* cannot justify the stop in this case because in *Terry* the police officer stopped the defendant after only a short period of observing him engage in suspicious activity, whereas in the present case Government agents had been observing the defendant for weeks and thus had considered her a suspect. We cannot accept the defendant's unreasonably narrow reading of *Terry.* Neither logic nor the Constitution supports an interpretation that would preclude a *Terry* stop merely because the officers have observed more suspicious conduct than was observed in *Terry* and observed that conduct over a longer time period. Indeed, the defendant cites no authority to support her novel argument.[3]

■ The defendant's second theory supporting the district court's suppression of the statement, and the theory on which the court apparently relied, is that the circumstances in which the defendant made the suppressed statement were sufficiently coercive to invoke the constitutional protections articulated in *Miranda.* Because the facts are essentially undisputed, the issue of

**2.** Although *Terry* did not involve the stop of a person in a car, that case had been read to encompass such a situation. *See United States v. Rainone,* 586 F.2d 1132 (7th Cir. 1978).

**3.** The defendant also argues that *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), is more analogous than *Terry* to the present case and, accordingly, because the seized evidence in *Sibron* was suppressed, so should be the statement in the present case. In *Sibron,* a police officer observed the defendant over an eight hour period converse with persons whom the officer knew to be narcotics addicts. The officer did not hear any of the conversations and did not see anything pass between Sibron and the addicts. The officer approached Sibron and said, "You know what I am after." As Sibron reached into his pocket, the officer thrust his hand into the same pocket seizing the heroin which the Court suppressed.

The concern of the Court in *Sibron* was the intrusion by a officer on an individual's personal security. The officer's search into Sibron's pocket was not a self-protection search for weapons and was not reasonable in view of the fact that the officer "was completely ignorant regarding the content of [the observed] conversations, and that he saw nothing pass between Sibron and the addicts." 392 U.S. at 62, 88 S.Ct. at 1902. In the present case, in contrast, the officers had observed the defendant receive a bag under most suspicious circumstances, which observation was made after discovering by way of background the defendant's association with a suspected narcotics dealer. Moreover, they did not search her or her vehicle until her response to Irwin's first question confirmed their suspicions. Under these circumstances, the officers clearly were justified in stopping and asking the defendant a question regarding their suspicions.

whether *Miranda* warnings were required before the defendant made her suppressed statement is one of law. Thus, the Government has the burden of proving that the district court erred in its decision to suppress the statement, and we are of the opinion that the Government met that burden in this case.

We note initially that contrary to the defendant's arguments in this appeal, she was not placed under arrest before she made the suppressed statement. The record clearly indicates that the arrest occurred sometime after the officers' suspicions regarding her possession of narcotics were confirmed by her statement, "You know what it is." The point at which an arrest occurs is a factual issue that must be determined on a case-by-case basis. Rather than pointing to facts in the record to support her assertion, the defendant cites two cases in which courts have held that an arrest occurred when the defendant's car was stopped by police officers, *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), and *United States v. Burhannon,* 388 F.2d 961 (7th Cir. 1968). Neither case is factually analogous. In *Henry* the Government *conceded* that the arrest occurred when the officers stopped the defendant's car, and in *Burhannon* the court reached the same conclusion but failed to articulate its reasons therefor. Significantly, the opinion in *Burhannon* does not state or even suggest that an arrest occurs whenever officers stop a car.

A more illuminating case on this issue is *Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), in which the Supreme Court concluded that "the validity of the search thus turns [on] the narrow question of when the arrest occurred, and the answer to that question depends upon an evaluation of the conflicting testimony of those who were there that night." *Id.* at 262, 80 S.Ct. at 1437. The Court then vacated the judgment and remanded to the district court for that determination. The district court recounted the facts and concluded that although the police officer had approached the taxi in which the defendant was riding and had identified himself as an officer, the arrest did not occur until the defendant then dropped a receptacle of heroin on the floor and alighted from the taxi. *United States v. Rios,* 192 F.Supp. 888, 889 (S.D.Cal.1961). Similarly, in the present case the testimony at the suppression hearing established that the officers did not arrest the defendant until sometime after she made the statement. Merely stopping her car and asking her one question without displaying any weapons and without physically restraining the defendant or threatening such restraint did not constitute an arrest. A contrary result would contravene the very purpose of the investigatory *Terry*-type stop which is to "allow the officer to confirm or deny [his] suspicions by reasonable questioning, rather than forcing in each instance the 'all or nothing' choice between arrest and inaction." *United States v. Hickman,* 523 F.2d 323, 327 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). *See also United States v. Rainone,* 586 F.2d at 1134.

That the defendant was not under arrest when she made the suppressed statement does not answer the critical question in this appeal of whether, given the circumstances of her statement, she was constitutionally entitled to be given *Miranda* warnings. The Government argues, and we agree, that the defendant's statement was not made during a "custodial interrogation" or "while otherwise deprived of [her] freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 445, 86 S.Ct. at 1612. This issue is "[p]robably the most difficult and frequently raised question in the wake of [*Miranda v. Arizona*] . . . ." *United States v. Hall,* 421 F.2d 540, 541 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), *quoting,* Kamisar, "Custodial Interrogation" with the Meaning of *Miranda,* in Criminal Law and the Constitution 335 (1968). *Miranda* was "grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of . . . in-custody interrogation,' 384 U.S. at 445, 86 S.Ct. 1602." *Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

The extent to which *Miranda* applies to street encounters or car stops depends on whether these encounters reflect the type of inherently coercive tactics that may often attend a station-house interrogation. The type of special circumstances that might transform on-the-street questioning into a custodial interrogation, such as when the police inquiry is made at gunpoint, is not present in the instant case.[4] Neither Irwin nor the two police officers that confronted the defendant displayed a weapon or in any way threatened the defendant either physically or verbally. They did not touch her, not even to frisk her for weapons. They merely curbed her car, and when she got out of her car, Irwin walked toward her, displayed his badge, and asked her the one question which elicited the response suppressed by the district court.[5] This simply does not present the custodial atmosphere that concerned the Court in *Miranda*[6] and we are aware of no federal case law to support or even portend an expansive interpretation of *Miranda* to cover these facts.

The defendant alludes to the importance of the "focus test" to determine whether the suppressed statement was made in a custodial setting. This test evolved from a rather cryptic footnote in *Miranda*, 384 U.S. at 444 n. 4, 86 S.Ct. 1602, and has been interpreted to require *Miranda* warnings when a criminal investigation has focused on the defendant. *See, e.g., Commonwealth v. D'Nicuola*, 448 Pa. 54, 292 A.2d

333, 335 (1972). This test was clearly rejected by the Supreme Court in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). The defendant in that case had argued that "the principle of *Miranda* and *Mathis* [*Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)] should be extended to cover interrogation in noncustodial circumstances after a police investigation has focused on the suspect." *Id.* at 345, 96 S.Ct. at 1616. The Court dismissed this argument stating:

> we "are not impressed with this argument in the abstract nor as applied to the particular facts of Beckwith's interrogation." *Ibid.* It goes far beyond the reasons for that holding and such an extension of the *Miranda* requirements would cut this Court's holding in that case completely loose from its own explicitly stated rationale.

*Id.* The Court further articulated its reasons for rejecting the focus test by quoting with approval from the Second Circuit's opinion in *United States v. Caiello*, 420 F.2d 471, 473 (2d Cir. 1969):

> "It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions as the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning."

425 U.S. at 346–47, 96 S.Ct. at 1616.

The defendant in the present case concedes that after *Beckwith* the focus test

---

4. *See* Kamisar, *Kauper's "Judicial Examination of the Accused" Forty Years Later—Some Comments on a Remarkable Article*, 73 Mich.L. Rev. 15, 25 n. 33 (1974).

5. The presence of other unmarked cars containing Government agents that parked somewhere behind Irwin's car would be a factor in evaluating whether Irwin asked the question in a custodial setting. The record is unclear whether the traffic was such that the defendant would have noticed these other unmarked cars and whether the defendant would have perceived them to be associated with Irwin or the police officers who curbed her car. The agents in these cars were not in uniform and remained in their cars at the time Irwin asked the question. Assuming *arguendo* that the defendant would reasonably have noticed these cars and linked

them to the officers who confronted her, we are of the opinion that this would be insufficient to transform an otherwise non-custodial setting into a custodial setting.

6. *See, e.g., United States v. Marzett*, 526 F.2d 277 (5th Cir. 1976), in which an officer arrived at the scene of the crime to investigate a complaint which reportedly involved a disorderly person with a gun. A man approached the officer and pointed down the street at the defendant and said, "That is the man you want." The officer, who apparently recognized the defendant, approached him and asked, "Where is the gun, John?" The defendant told him the location of the gun and the officer then seized it. The court concluded that the officer's question did not constitute a custodial interrogation under *Miranda*.

cannot be applied in a per se fashion. She contends, however, that focus remains an *important* factor in determining whether the interrogation was custodial. We cannot agree. The language the Court quoted from *Caiello* precludes such an interpretation. Indeed, a recent opinion from the First Circuit cogently articulates the current status of the focus rule stating that "neither the subjective intent of the officer and the defendant nor whether the authorities have focused on the defendant are the relevant considerations . . ." and that the critical question is "whether the defendant had been deprived of his freedom in [any] significant way." *Borodine v. Douzanis*, 592 F.2d 1202, 1206 n. 2 (1st Cir. 1979). Whether the investigation had focused on the defendant, however, may be indirectly relevant to whether the questioning was custodial for *Miranda* purposes.[7] If the police officers were questioning an accused, for example, the inference might be drawn that they would not permit the accused to leave, and that the accused would be aware of his inability to leave. Such an inference would of course relate to whether their questioning was custodial. We are reluctant to draw such an inference unless it is clear that the officers had, prior to their questioning, sufficient evidence to place the defendant in the status of an accused or in a position analogous thereto and that the defendant was aware of that status.

The First Circuit was similarly reluctant to draw such an inference in *Borodine*. The facts in that case are illustrative. Police officers were summoned to the parental home of the defendant's girlfriend, Joan. Joan's sister-in-law met them outside the house and told them, "She's downstairs in the cellar covered with blood. I think they had a fight." Officer Wargin ran downstairs and found Joan battered and dead with the defendant kneeling beside her. The defendant was naked from the waist up and had blood on his upper torso and hands. A bloodied steam iron lay nearby. Officer Wargin questioned the defendant for about ten minutes before the other officer arrived. When the other officer arrived he gave the defendant *Miranda* warnings and then both officers continued questioning him.

The First Circuit affirmed the district court's refusal to suppress the statements made prior to the *Miranda* warnings. The First Circuit was unwilling to conclude that at the time of the initial questioning, the investigation had focused on the defendant sufficiently to draw the inference that the defendant was thus in custody. The court stated:

> The fact that it became increasingly likely that appellant had played a role in the slaying, resulting in a later interrogation—preceded by *Miranda* warnings— during which he undoubtedly would not have been permitted to leave and in his subsequent arrest does not convince us that appellant had been deprived of his freedom in a significant way during the initial period of questioning.

592 F.2d at 1207 n. 3. Thus, although "focus" may have an indirect bearing on whether questioning is custodial, it does not weigh heavily in that analysis and must be viewed in light of all the other relevant circumstances. Moreover, to the extent

---

**7.** The extent to which the courts after *Beckwith* have considered focus as even an indirect factor in determining whether the interrogation is custodial for *Miranda* purposes is unclear. See *United States v. Craig,* 573 F.2d 455, 474 (7th Cir. 1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1979); *United States v. Dreske,* 536 F.2d 188, 194–95 (7th Cir. 1976). *Cf. United States v. Warren,* 578 F.2d 1058, 1072 (5th Cir. 1978) (en banc court stated that if none of the other factors suggesting a custodial interrogation were present, "that the investigation is focused upon the defendant is insufficient to render the interrogation custodial");

*United States v. Lewis,* 556 F.2d 446, 448–49 (6th Cir. 1977) *cert. denied,* 434 U.S. 863, 98 S.Ct. 193, 54 L.Ed.2d 137. The D.C. Circuit, in contrast, interprets *Beckwith* to mean that "a person does not become the 'focus' of a criminal investigation for purposes of triggering *Miranda* until he 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *United States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31, 92 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Under this interpretation, focus would appear to play no part in the "custodial interrogation" determination.

that focus may be given any weight in the analysis, that weight is decreased in direct proportion to the defendant's ignorance of the officer's knowledge of evidence against the defendant. That is, even if the officer's investigation has focused directly on her, the defendant will not as a result, reasonably perceive a restraint in her freedom unless she is aware of the officer's knowledge. Thus, focus is irrelevant unless the defendant could reasonably have been aware that the investigation had focused on her.[8]

Considering all the circumstances surrounding Irwin's questioning of the defendant in this case, we are of the opinion that *Miranda* warnings were not required and, accordingly, that the defendant's statement should not have been suppressed.[9] The order of the district court is, therefore, reversed.

8. *But see Kwok T. v. Mauriello,* 43 N.Y.2d 213, 401 N.Y.S.2d 52, 371 N.E.2d 814, 818 (1977).

9. In *Beckwith,* the Court noted that a noncustodial interrogation "might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of

. . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" 425 U.S. 348, 96 S.Ct. 1617. The present case does not involve this sort of special circumstances.